NATIONAL LABOR RELATIONS BOARD *v.* PLAS-
TERERS' LOCAL UNION NO. 79, OPERATIVE
PLASTERERS' & CEMENT MASONS' IN-
TERNATIONAL ASSN., AFL–CIO, ET AL.

No. 70–63.  Argued October 13, 1971—Decided December 6, 1971*

---

*Together with No. 70–65, *Texas State Tile & Terrazzo Co., Inc.,
et al.* v. *Plasterers' Local Union No. 79, Operative Plasterers' & Ce-
ment Masons' International Assn., AFL–CIO, et al.,* also on certi-
orari to the same court.

*Norton J. Come* argued the cause for petitioner in No. 70–63. With him on the brief were *Solicitor General Griswold, Richard B. Stone, Arnold Ordman, Dominick L. Manoli,* and *Marvin Roth. Wayne S. Bishop* argued the cause and filed a brief for petitioners in No. 70–65.

*Donald J. Capuano* argued the cause for respondents. With him on the brief were *Martin F. O'Donoghue* and *Patrick C. O'Donoghue.*

*Laurence Gold* argued the cause for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance. On the brief was *Thomas E. Harris.*

Briefs of *amici curiae* urging reversal were filed by *Joseph M. Stone, George L. Plumb,* and *Betty Southard Murphy* for Associated General Contractors of America et al.; by *Robert J. Connerton, Arthur M. Schiller,* and *Jules Bernstein* for the Laborers' International Union of North America, AFL–CIO; and by *Albert E. Jenner, Jr.,* and *Chester T. Kamin* for the Scientific Apparatus Makers Assn.

*Louis Sherman* and *Elihu I. Leifer* filed a brief for the Building and Construction Trades Department, AFL–CIO, as *amicus curiae* urging affirmance.

MR. JUSTICE WHITE delivered the opinion of the Court.

When a charge is filed under § 8 (b)(4)(D) of the National Labor Relations Act, as amended, the provision [1] banning so-called jurisdictional disputes, the Board must under § 10 (k) "hear and determine the dispute out of which [the] unfair labor practice shall have arisen, unless . . . the parties to such dispute" adjust or agree upon a method for the voluntary adjustment of the dispute.[2]

---

[1] 61 Stat. 136, 29 U. S. C. § 141 *et seq.*

[2] Section 8 (b)(4) provides that it shall be an unfair labor practice for a labor organization or its agents "(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise, handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

.        .        .        .        .

"(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work." 29 U. S. C. § 158 (b)(4).

Section 10 (k) provides:

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158 (b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed." 29 U. S. C. § 160 (k).

The issue here is whether an employer, picketed to force reassignment of work, is a "party" to the "dispute" for purposes of § 10 (k). When the two unions involved, but not the employer, have agreed upon a method of settlement, must the Board dismiss the § 10 (k) proceedings or must it proceed to determine the dispute with the employer being afforded a chance to participate?

## I

Texas State Tile & Terrazzo Co. (Texas State) and Martini Tile & Terrazzo Co. (Martini) are contractors in Houston, Texas, engaged in the business of installing tile and terrazzo. Both have collective-bargaining agreements with the Tile, Terrazzo and Marble Setters Local Union No. 20 (Tile Setters) and have characteristically used members of the Tile Setters union for laying tile and also for work described in the collective-bargaining contract as applying "a coat or coats of mortar, prepared to proper tolerance to receive tile on floors, walls and ceiling regardless of whether the mortar coat is wet or dry at the time the tile is applied to it." [3]

This case arose when Plasterers' Local Union No. 79, Operative Plasterers' and Cement Masons' International Association of Houston, Texas (Plasterers), picketed the job sites of Texas State and Martini claiming that the work of applying the mortar to receive tile was the work of the Plasterers' union and not of the Tile Setters. [4] Neither Texas State nor Martini had a collective-bargaining contract with the Plasterers or regularly employed workers represented by that union.

Before the Texas State picketing began, the Plasterers submitted their claim to the disputed work to the National Joint Board for Settlement of Jurisdictional Dis-

---

[3] App. 20.

[4] This dispute grew out of a new method of applying tile that was developed in the mid-1950's. R. 111, 123, 135.

putes (Joint Board), a body established by the Building Trades Department, AFL–CIO, and by certain employer groups.[5] Both the Plasterers' and the Tile Setters' locals were bound by Joint Board decisions because their international unions were members of the AFL–CIO's Building Trades Department. Neither Texas State nor Martini had agreed to be bound by Joint Board procedures and decisions, however. The Joint Board found the work in dispute to be covered by an agreement of August 1917, between the two international unions, and awarded the work to the Plasterers.[6] When Texas State and the Tile

---

[5] The National Joint Board for the Settlement of Jurisdictional Disputes is an arbitration panel established by a 1948 agreement between the Building and Construction Trades Department, AFL–CIO, and the Associated General Contractors of America and several specialty contractors' associations. The Joint Board consists of an equal number of representatives of employers and unions and a neutral chairman. An employer may become a party to a Joint Board proceeding by signing a stipulation agreeing to be bound by the results of the proceeding. Art. III, § 7, AFL–CIO, Bldg. & Constr. Trades Dept., Plan for Settling Jurisdictional Disputes Nationally and Locally 10 (1970). Member unions of the AFL–CIO's Building Trades Department do not have to agree formally to abide by Joint Board decisions, because they are bound by virtue of provisions contained in their constitutions. AFL–CIO, Bldg. & Constr. Trades Dept., Procedural Rules and Regulations of the National Joint Board 2 (1970). See generally K. Strand, Jurisdictional Disputes in Construction: The Causes, the Joint Board, and the NLRB 89–104 (1961). In the cases here, both the Tile Setters and the Plasterers were members of the Building Trades Department.

[6] In the Texas State case, the Joint Board on November 9, 1966, awarded all of the disputed work to the Plasterers except "any coat to be applied wet the same day under tile." App. 316. The Tile Setters refused to give up the work of laying the plaster undercoat to which the dry mortar was applied, claiming that the Joint Board decision gave this work to them. The Plasterers established a picket line on January 24, 1967; on March 15, 1967, the Joint Board issued a clarification of its decision, stating that the final smooth plaster coat was to be done by the Plasterers unless it was laid the same day as the tile and dry-set mortar were applied, in which case it was to be done by the Tile Setters. App. 341.

Setters refused to acquiesce in the Joint Board decision and change the work assignment, the Plasterers began the picketing of Texas State which formed the basis for the § 8 (b)(4)(D) charges. The Plasterers also picketed a jobsite where Martini employees, members of the Tile Setters, were installing tile, although this dispute had not been submitted to the Joint Board.

Martini and Southwestern Construction Co., the general contractor that had hired Texas State, filed § 8 (b)(4)(D) unfair labor practice charges against the Plasterers, and the NLRB's Regional Director noticed a consolidated § 10 (k) hearing to determine the dispute.[7] Southwestern, Texas State, Martini, and the two unions participated in the hearing. A panel of the Board noted that the Tile Setters admitted being bound by Joint Board procedures, but deemed the Joint Board decision to lack controlling weight,[8] and "after taking into account and balancing all relevant factors" awarded the work to the Tile Setters.[9] When the Plasterers refused

---

[7] The employer-subcontractor, Texas State, intervened as a party.

[8] App. 22.

[9] The NLRB considered the collective-bargaining agreements among the parties, industry and area practice, relative skills and efficiency of operation, past practices of the employers, agreements between the Plasterers and the Tile Setters, the Joint Board award (the NLRB refused to give this controlling weight because of its "ambiguous nature," App. 22), and concluded:

"Tile setters are at least as skilled in the performance of the work as plasterers, and both Texas Tile and Martini, which assigned them to the work, have been satisfied with both the quality of their work and the cost of employing them. Moreover, the instant assignments of the disputed work to tile setters are consistent with the explicit provisions of the collective-bargaining agreement between the Tile Setters and Texas Tile and Martini, are consistent with the past practice of the Employers, and are not inconsistent with area or industry practice. . . ." App. 23. The Board's decision in the § 10 (k) proceeding is reported at 167 N. L. R. B. 185 (1967) and its decision and order in the unfair labor practice proceeding are reported at 172 N. L. R. B. Nos. 70, 72 (1968).

to indicate that they would abide by the Board's award, a § 8 (b)(4)(D) complaint was issued against them, and they were found to have committed an unfair labor practice by picketing to force Texas State and Martini to assign the disputed work to them.[10]  In making both the § 10 (k) and § 8 (b)(4)(D) decisions, the Board rejected the Plasterers' contention that even though the employer had not agreed to be bound by the Joint Board decision, the provisions of § 10 (k) precluded a subsequent Board decision because the competing unions had agreed upon a voluntary method of adjustment.

On petition to review by the Plasterers and cross petition to enforce by the Board, a divided panel of the Court of Appeals set aside the order of the Board.[11]  It held that: "It is not the employer but the rival unions (or other employee groups) who are the parties to the jurisdictional dispute contesting which employees are entitled

---

[10] The § 10 (k) determination is not binding as such even on the striking union.  If that union continues to picket despite an adverse § 10 (k) decision, the Board must prove the union guilty of a § 8 (b)(4)(D) violation before a cease-and-desist order can issue. The findings and conclusions in a § 10 (k) proceeding are not *res judicata* on the unfair labor practice issue in the later § 8 (b)(4)(D) determination. *International Typographical Union,* 125 N. L. R. B. 759, 761 (1959).  Both parties may put in new evidence at the § 8 (b)(4)(D) stage, although often, as in the present cases, the parties agree to stipulate the record of the § 10 (k) hearing as a basis for the Board's determination of the unfair labor practice. Finally, to exercise its powers under § 10 (k), the Board need only find that there is reasonable cause to believe that a § 8 (b)(4)(D) violation has occurred, while in the § 8 (b)(4)(D) proceeding itself the Board must find by a preponderance of the evidence that the picketing union has violated § 8 (b) (4)(D).  *International Typographical Union, supra,* at 761 n. 5 (1959).

[11] 142 U. S. App. D. C. 146, 440 F. 2d 174 (1970).

to seek the work in question." [12]   It concluded that the Board may not make a § 10 (k) determination of a jurisdictional dispute where the opposing unions have agreed to settle their differences through binding arbitration. Both the Board and the employers petitioned for certiorari, and we granted the petitions.[13]

## II

Section 8 (b)(4)(D) makes it an unfair labor practice for a labor organization to strike or threaten or coerce an employer or other person in order to force or require an employer to assign particular work to one group of employees rather than to another, unless the employer is refusing to honor a representation order of the Board. On its face, the section would appear to cover any union challenge to an employer work assignment where the prohibited means are employed. *NLRB* v. *Radio & Television Broadcast Engineers Union, Local 1212,* 364 U. S. 573, 576 (1961) (hereinafter *CBS*). As the charging or intervening party, the employer would normally be a party to any proceedings under that section.[14] Section 8 (b)(4)(D), however, must be read in light of § 10 (k) with which it is interlocked. *CBS, supra,* at 576. When a § 8 (b)(4)(D) charge is filed and there is reasonable cause to believe that an unfair labor practice has been

---

[12] *Id.,* at 152, 440 F. 2d, at 180. Although the dispute at the Martini worksite had not been submitted to the Joint Board, the Court of Appeals nevertheless held that, because the two unions had agreed to be bound by the procedures and decisions of the Joint Board, the NLRB was precluded from hearing and determining the Martini dispute under § 10 (k).

[13] 401 U. S. 973 (1971).

[14] See 29 CFR §§ 102.8, 102.9, 102.109 (1971); *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, AFL–CIO, Local 283* v. *Scofield,* 382 U. S. 205, 219–221 (1965).

committed, issuance of the complaint is withheld until the provisions of § 10 (k) have been satisfied. That section directs the Board to "hear and determine" the dispute out of which the alleged unfair labor practice arose; the Board is required to decide which union or group of employees is entitled to the disputed work in accordance with acceptable, Board-developed standards, unless the parties to the underlying dispute settle the case or agree upon a method for settlement. Whether the § 8 (b) (4) (D) charge will be sustained or dismissed is thus dependent on the outcome of the § 10 (k) proceeding. The Board allows an employer to fully participate in a § 10 (k) proceeding as a party. If the employer prefers the employees to whom he has assigned the work, his right to later relief against the other union's picketing is conditioned upon his ability to convince the Board in the § 10 (k) proceeding that his original assignment is valid under the criteria employed by the Board.

The alleged unfair labor practice in this cause was the picketing of the jobsites by the Plasterers, and the dispute giving rise to this picketing was the disagreement over whether Plasterers or Tile Setters were to lay the final plaster coat. This dispute was a three-cornered one. The Plasterers made demands on both Texas State and the Tile Setters and on both Martini and the Tile Setters. In both cases, the employers' refusal to accede to the Plasterers' demands inevitably and inextricably involved them with the Tile Setters against the Plasterers. It was this triangular dispute that the § 10 (k) proceeding was intended to resolve.

It may be that in some cases employers have no stake in how a jurisdictional dispute is settled and are interested only in prompt settlement. Other employers, as shown by this cause, are not neutral and have substantial economic interests in the outcome of the § 10 (k) proceeding. A change in work assignment may result in different

terms or conditions of employment, a new union to bargain with, higher wages or costs, and lower efficiency or quality of work. In the construction industry, in particular, where employers frequently calculate bids on very narrow margins, small cost differences are likely to be extremely important.[15] In the present cause, both employers had collective-bargaining contracts with the Tile Setters specifically covering the work at issue; neither had contracts with the Plasterers nor employed Plasterers regularly. Both employers determined it to be in their best interests to participate vigorously in the Board's § 10 (k) proceeding. The employers contended it was more efficient and less costly to use the same craft for applying the last coat of plaster, putting on the bonding coat, and laying the tile and that it was more consistent with industry practice to use the Tile Setters as they did.[16] Both companies claimed that their costs would be substantially increased if the award went to the Plasterers, and that without collective-bargaining contracts with the Plasterers, they would lose 30%–40% of their work to plastering contractors.[17] It is obvious, therefore, that both Texas State and Martini had substantial stakes in the outcome of the § 10 (k) proceeding.

The phrase "parties to the dispute" giving rise to the picketing must be given its commonsense meaning corresponding to the actual interests involved here. Cf. *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, AFL–CIO, Local 283* v. *Scofield,* 382 U. S. 205, 220 (1965). Section 10 (k) does not expressly or impliedly deny party status to an employer, and since the section's adoption in 1947,

---

[15] See Comment, The Employer as a Necessary Party to Voluntary Settlement of Work Assignment Disputes Under Section 10 (k) of the NLRA, 38 U. Chi. L. Rev. 389, 400 (1971).

[16] R. 96–97, 130–132, 141.

[17] R. 95, 129, 145–148.

126

the Board has regularly accorded party status to the employer and has refused to dismiss the proceeding when the unions, but not the employer, have agreed to settle.[18]

The Court of Appeals rejected this construction of § 10 (k). Its reasoning, which we find unpersuasive, was that because the employer is not bound by the § 10 (k) decision, he should have no right to insist upon participation. But the § 10 (k) decision standing alone, binds no one. No cease-and-desist order against either union or employer results from such a proceeding; the impact of the § 10 (k) decision is felt in the § 8 (b)(4)(D) hear-

---

[18] See, e. g., Lodge 68 of the Int'l Assn. of Machinists (Moore Drydock Co.), 81 N. L. R. B. 1108, 1113–1114, 1126–1128 (1949); Local 231, Int'l Hod Carriers (Middle States Telephone Co.), 91 N. L. R. B. 598, 604 (1950); United Brotherhood of Carpenters, Local 581 (Ora Collard), 98 N. L. R. B. 346, 348–349 (1952); United Assn. of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, 108 N. L. R. B. 186, 197 (1954); Bay Counties District Council of Carpenters, 115 N. L. R. B. 1757, 1766–1767 (1956); Local 173, Wood, Wire, & Metal Lathers' Int'l Union (Newark & Essex Plastering Co.), 121 N. L. R. B. 1094, 1103–1104 (1958); Int'l Union of Operating Engineers (Schwerman Co. of Pa., Inc.), 139 N. L. R. B. 1426, 1429 (1962); Carpenters District Council of Denver (J. O. Veteto & Son), 146 N. L. R. B. 1242, 1245 (1964); Electrical Workers, Local 26 (McCloskey & Co.), 147 N. L. R. B. 1498, 1501–1503 (1964); Operative Plasterers Int'l Assn. (Twin City Tile & Marble Co.), 152 N. L. R. B. 1609, 1611, 1615 (1965); Int'l Union of Operating Engineers, Local 49 (Egan-McKay Electrical Contractors, Inc.), 164 N. L. R. B. 672, 673 (1967). The Board has reasserted this view since the Court of Appeals' decision in the instant case, Lathers Local 104 (Blaine Petty Co.), 186 N. L. R. B. No. 70 (1970). Until now, courts of appeals have uniformly upheld the Board's position; see, e. g., New Orleans Typographical Union No. 17 v. NLRB, 368 F. 2d 755, 763 (CA5 1966), NLRB v. Local 825, Int'l Union of Operating Engineers, 326 F. 2d 213, 216 (CA3 1964); Local 450, Int'l Union of Operating Engineers v. Elliott, 256 F. 2d 630, 636 (CA5 1958). See also Carey v. Westinghouse Electric Corp., 375 U. S. 261, 264 (1964), citing Wood, Wire & Metal Lathers Int'l Union (Acoustical Contractors Assn.), 119 N. L. R. B. 1345, 1347 (1958).

ing because for all practical purposes the Board's award determines who will prevail in the unfair labor practice proceeding. If the picketing union persists in its conduct despite a § 10 (k) decision against it, a § 8 (b) (4) (D) complaint issues and the union will likely be found guilty of an unfair labor practice and be ordered to cease and desist. On the other hand, if that union wins the § 10 (k) decision and the employer does not comply, the employer's § 8 (b) (4) (D) case evaporates and the charges he filed against the picketing union will be dismissed.[19] Neither the employer nor the employees to whom he has assigned the work are legally bound to observe the § 10 (k) decision, but both will lose their § 8 (b) (4) (D) protection against the picketing which may, as it did here, shut down the job. The employer will be under intense pressure, practically, to conform to the Board's decision. This is the design of the Act; Congress provided no other way to implement the Board's § 10 (k) decision.

We do not find that the legislative history of § 8 (b) (4) (D) and § 10 (k) requires a different conclusion. The Court of Appeals and the Plasterers rely upon various statements in the legislative history of the two sections, particularly the remarks of Senator Morse, referring to

---

[19] This dismissal will not be pursuant to the language of § 10 (k) directing dismissal upon "compliance by the parties . . . with the [Board's] decision" but, rather, under § 8 (b) (4) (D) because the "employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work." Apparently, the Board construes this language to include disregarding a § 10 (k) decision. Brief for the NLRB 23 n. 16, 28 n. 21. The Board's regulations now provide that "if the Board determination is that employees represented by a charged union are entitled to perform the work in dispute, the regional director shall dismiss the charge as to that union irrespective of whether the employer has complied with that determination." 36 Fed. Reg. 9133 (1971).

jurisdictional disputes as controversies between two labor unions,[20] and a passage in the House Conference Report referring to § 10 (k) as directing the Board to "hear and determine disputes between unions giving rise to unfair labor practices under section 8 (b)(4)(D)."[21] Nothing in these remarks or in the other relevant legislative documents indicates an affirmative intent to exclude an interested employer from participating in a § 10 (k) proceeding. The usual focus of the legislative debates was on ways of protecting the employer from the economic havoc of jurisdictional strikes.[22] But it does not follow from statements condemning the economically deleterious effects of inter-union strife that Congress intended an employer to have no say in a decision that may, practically, affect his business in a radical way. Congress did not expressly focus on the non-neutral employer, but there is nothing in the legislative history that negatives employer standing;[23] and in referring to the "parties

---

[20] 93 Cong. Rec. 1845. Cf. also 93 Cong. Rec. 1824 (remarks of Sen. Morse).

[21] H. R. Conf. Rep. No. 510 on H. R. 3020, 80th Cong., 1st Sess., 57 (1947).

[22] See, e. g., 93 Cong. Rec. A1222–A1223 (remarks of Cong. Landis); 93 Cong. Rec. 3424 (remarks of Cong. Hartley); 93 Cong. Rec. 3227–3228 (remarks of Sen. Lucas); 93 Cong. Rec. 4860–4862 (remarks of Sen. Aiken); 93 Cong. Rec. A2251–A2253 (remarks of Sen. Ball). Section 10 (k) protection was also extended to unorganized employees. In the Senate bill, § 8 (b)(4)(D) covered only cases where two unions claimed the same work, but the section was broadened in the Conference Committee to cover conflicts between organized and unorganized employees. See CBS, 364 U. S., at 584.

[23] In what is apparently the only time employer participation in the resolution of jurisdictional disputes was explicitly considered, Senator Taft indicated that the employer should be a party to the proceeding:

"Mr. MORREALE [General Counsel, International Hodcarriers, Building, and Common Laborers of America]. . . . I do not think

to the dispute," Congress used terminology that would ordinarily include the employer in cases such as these.[24]

The Court has frequently cautioned that "[i]t is at best treacherous to find in congressional silence alone the

[compulsory arbitration between the antagonistic unions] should be just by labor itself, but that it should be in combination with industry, because in all those matters, the employers are affected and interested, as well as is labor. I think that the procedure set up should provide for a joint procedure between management and labor.

"The CHAIRMAN [Sen. Taft]. . . . I have no objection to giving both to labor and management the right to arbitrate or address themselves to arbitrating the question."

Hearings on S. 55 before the Senate Committee on Labor and Public Welfare, 80th Cong., 1st Sess., pt. 3, p. 1467 (1947).

The arbitration provision in the Senate version of § 10 (k) was deleted without explanation in Conference. See n. 27, *infra.*

[24] In construing a statute, the Court has ruled that legislative materials, if "without probative value, or contradictory, or ambiguous," should not be permitted to control the customary meaning of words. *United States* v. *Dickerson,* 310 U. S. 554, 562 (1940). See also *Gemsco, Inc.* v. *Walling,* 324 U. S. 244, 260 (1945).

The Court has previously had occasion to construe the term "party" in the National Labor Relations Act, and it has given it a broad and realistic definition. In *Lewis* v. *NLRB,* 357 U. S. 10 (1958), the issue was whether the Board's General Counsel was a "party" who could apply to the Board for the issuance of a subpoena. The General Counsel had obtained subpoenas *duces tecum* and *ad testificandum* to both an employer and a union after an unfair labor practice complaint had been issued; at the hearing on the complaint, the employer and union had moved to revoke the subpoenas on the ground that the General Counsel was not a "party" for purposes of § 11 (1) of the Act which provides that: "The Board, or any member thereof, shall upon application of any party . . . forthwith issue . . . subpoenas . . . ."

The Court noted that the Act does not define the term "party," but it emphasized that the role of the General Counsel was a "major one" in unfair labor practice proceedings. 357 U. S., at 15. The General Counsel was held to be a party because he was "indispensable to the prosecution of the case" and because relegating him to a

adoption of a controlling rule of law." *Girouard* v. *United States,* 328 U. S. 61, 69 (1946); *Boys Markets, Inc.* v. *Retail Clerks Union, Local 770,* 398 U. S. 235, 241 (1970). It is clear that Congress intended to protect employers and the public from the detrimental economic impact of "indefensible"[25] jurisdictional strikes. It would therefore be myopic to transform a procedure that was meant to protect employer interests into a device that could injure them. In the absence of an "unmistakable directive," the Court has refused to construe legislation aimed to protect a certain class in a fashion that will run counter to the goals Congress clearly intended to effectuate. *FTC* v. *Fred Meyer, Inc.,* 390 U. S. 341, 349 (1968). We conclude, therefore, that these sections were enacted to protect employers who are partisan in a jurisdictional dispute as well as those who are neutral.

Nothing in *CBS, supra,* mandates a different conclusion. Until that case, the Board's practice had been

---

lesser status would "overlook the critical role he performs in enforcement of the Act." 357 U. S., at 16. This description is equally applicable to an employer's function in a § 8 (b) (4) (D) proceeding. In *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, AFL–CIO, Local 283* v. *Scofield,* 382 U. S. 205 (1965), the Court went through a somewhat similar analysis of the substantive interests involved at the judicial enforcement stage of an unfair labor practice proceeding, and concluded that a successful "charged" or "charging" party before the Board had a right to intervene in the ensuing Court of Appeals action.

Excluding the employer from participation as a party is inconsistent with the common-law rule that "all persons materially interested in the result of a suit ought to be made parties, so that the court may . . . 'do complete justice.'" *Vetterlein* v. *Barnes,* 124 U. S. 169, 170–171 (1888). *Story* v. *Livingston,* 13 Pet. 359, 375 (1839).

[25] President Truman, 1947 State of the Union Message, 93 Cong. Rec. 136.

to decide against the striking or picketing union unless it was entitled to the work pursuant to a Board certification or a collective-bargaining contract. The Court found the Board to have taken too narrow a view of its task and held that the Board, employing broader, more inclusive criteria with respect to entitlement, must make an affirmative award to one union or the other. In the course of its opinion, the Court referred to § 10 (k)'s phrase "the dispute out of which such unfair labor practice shall have arisen" as having "no other meaning except a jurisdictional dispute under § 8 (b)(4)(D) which is a dispute between two or more groups of employees over which is entitled to do certain work for an employer." 364 U. S., at 579. Again, we have no quarrel with the view that § 10 (k) is designed to decide which union is entitled to the work. But the issue before us is whether the employer is also a party to that dispute and to the proceeding that decides that question. The Court in *CBS* did not have before it a case in which the employer was particularly interested in which union did the work, since it had collective-bargaining contracts with both unions and since both unions were able to do the disputed work with equal skill, expense, and efficiency. The Court recognized that there, *"as in most instances"* the quarrel was of "so little interest to the employer that he seems perfectly willing to assign work to either [union] if the other will just let him alone." *Ibid.* (emphasis added). We have no doubt, therefore, that the Court had no intention of deciding the case now before us.

If employers must be considered parties to the dispute that the Board must decide under § 10 (k), absent private agreement, they must also be deemed parties to the adjustment or agreement to settle that will abort the § 10 (k) proceedings. It is insisted that so holding will encourage employers to avoid private arbitration,

whereas holding union agreement alone sufficient to foreclose Board action will pressure employers to become part of private settlement mechanisms productive of sound result and much swifter decision.

The difficulties with this argument are several. First of all, if union agreements to arbitrate are sufficient to terminate § 10 (k) proceedings, there is no assurance that these private procedures will always be open to employer participation, that an employer will be afforded a meaningful chance to participate, or that all relevant factors will be properly considered.[26]

---

[26] The Board has stated its guidelines for resolving jurisdictional disputes:

"The Board will consider all relevant factors in determining who is entitled to the work in dispute, e. g., the skills and work involved, certifications by the Board, company and industry practice, agreements between unions and between employers and unions, awards of arbitrators, joint boards, and the AFL–CIO in the same or related cases, the assignment made by the employer, and the efficient operation of the employer's business. This list of factors is not meant to be exclusive, but is by way of illustration. . . . Every decision will have to be an act of judgment based on common sense and experience rather than on precedent." *Int'l Assn. of Machinists, Lodge 1743* (*J. A. Jones Construction Co.*), 135 N. L. R. B. 1402, 1410–1411 (1962).

The Joint Board award in this case was based solely on the Joint Board's interpretation of a 1917 agreement between the two international unions and a 1924 decision interpreting that agreement. R. 53, 69–70, 73–76. At the time of the dispute, the criteria used by the Joint Board in making awards were: "Decisions and agreements of record as set forth in the Green Book [the Building Trades Department's book of precedents], valid agreements between affected International Unions attested by the Chairman of the Joint Board, established trade practice and prevailing practice in the locality." Art. III, § 1 (a), AFL–CIO Bldg. & Constr. Trades Dept., Plan for Settling Jurisdictional Disputes Nationally and Locally (1965). These criteria were broadened in 1970 by the addition of Art. III, § 1 (f), which provides: "Because efficiency, cost and good management are essential to the well-being of the industry, the Joint Board

Second, the argument for regarding the employer as a dispensable neutral is reminiscent of the position taken by the Board and rejected by the Court in the *CBS* case. There, the Board sought to justify a narrow view of its function and its failure to make affirmative awards as generating pressure to settle or arbitrate privately. As § 10 (k) passed the Senate, it directed the Board to decide the dispute *or* to order arbitration, but the arbitration alternative was deleted in Conference, and the amended bill was passed by the Senate over the strenuous objections of Senator Morse and others.[27] By this amendment, the Court in *CBS* held that Congress had expressed a clear preference for Board decision as compared with compelled arbitration, and that this policy preference must be respected. 364 U. S., at 581–582. Although this Court has frequently approved an expansive role for private arbitration in the settlement of labor disputes, this enforcement of arbitration agreements and settlements has been predicated on the view that the parties have voluntarily bound themselves to such a mechanism at the bargaining table. In both *Carey* v. *Westinghouse Electric Corp.*, 375 U. S. 261, 262 (1964) and *Boys Markets, Inc.* v. *Retail Clerks Union, Local 770*, 398 U. S., at 238, the employers had acceded to binding arbitration as the terminal step of the grievance procedure. This concession is not present in the instant case; the employers here did not even have a collective-bargaining contract with the Plasterers. Section 10 (k) contemplates only a voluntary agreement as a bar to a Board decision. As in *CBS,* we decline to narrow the Board's powers under § 10 (k) so that employers are

---

should not ignore the interests of the consumer in settling jurisdictional disputes." AFL–CIO Bldg. & Constr. Trades Dept., Plan for Settling Jurisdictional Disputes Nationally and Locally 8 (1970).

[27] 93 Cong. Rec. 6452–6453; 93 Cong. Rec. 6519 (remarks of Sen. Pepper).

coerced to accept compulsory private arbitration when Congress has declined to adopt such a policy.

There remains the matter of the so-called *Safeway* rule announced by the Board in 1962 [28] and followed since.[29] Under this rule, the Board has held that if one of the unions claiming work effectively renounces its claim, § 10 (k) proceedings are aborted despite legitimate interests an employer may have in securing a Board decision. It is urged that if union agreement prevents a § 10 (k) decision in such a situation, the employer cannot be considered a party to the § 10 (k) dispute when the unions but not the employer have *agreed* upon a method of settlement. As we understand the *Safeway* doctrine, however, when one union disclaims the work, § 10 (k) proceedings terminate, not because all "parties" to the dispute have settled or agreed to settle within the meaning of the statute, but on the ground that, in the words of the Board's brief in this case, "the Board has power, under Section 10 (k), only to hear and determine the merits of a jurisdictional dispute and . . . by definition, such a dispute cannot exist unless there are rival claims to the work. . . ." [30] Concededly, an employer may be a third party to disputes over work assignments, but when

---

[28] *Highway Truckdrivers, Local 107 (Safeway Stores, Inc.),* 134 N. L. R. B. 1320 (1961).

[29] *Int'l Assn. of Bridge Workers, Local 678 (W. R. Aldrich & Co.),* 145 N. L. R. B. 943 (1964); *Carpet, Linoleum & Soft Tile Layers, Local 1905 (Butcher & Sweeney Construction Co.),* 143 N. L. R. B. 251 (1963); *Wood, Wire & Metal Lathers Union, Local 328 (Acoustics & Specialties, Inc.),* 139 N. L. R. B. 598 (1962).

[30] Brief for NLRB 30 n. 23. In a case interpreting the *Safeway* doctrine, the Board stated that § 10 (k) is limited "to situations involving competing claims between *rival* groups of employees, and [was] not designed to require the Board to arbitrate a dispute between a union and an employer when no . . . competing claims [of another union] are involved." *Carpet, Linoleum & Soft Tile Layers, Local 1905 (Butcher & Sweeney Construction Co.),* 143 N. L. R. B. 251, 255–256 (1963) (emphasis in original).

the other two parties settle their differences and one union declines the work assigned to it, the inter-union conflict that §§ 8 (b)(4)(D) and 10 (k) were designed to eliminate disappears. A § 10 (k) hearing is a comparative proceeding aimed at determining which union is entitled to perform certain tasks. Its function evaporates when one of the unions renounces and refuses the work. Similarly, the applicability of § 8 (b)(4)(D) is premised on conflicting claims of unions or groups of employees for the same job; absent such an actual conflict, it would be futile to proceed under that section unless the employer replaces the disclaiming employees by a new third group of employees when they reject the work assignment, and the disfavored union resumes picketing.

If union settlement followed by disclaimer ends the § 10 (k) case, some of the argument about the employer's party status becomes academic; for whether the employer is a party or not, the two unions alone can prevent a Board decision. But recognizing the employer's party status insures his right to participate when the unions do not agree and the Board must come to a decision. Further, the Board's *Safeway* rule applies only where the inter-union conflict is effectively settled and the employer no longer faces conflicting claims to the work. As this case demonstrates, the Board does not apply the *Safeway* rule to unimplemented agreements to arbitrate between the unions alone, and it does not consider it applicable where employees continue on the job after their international union loses an arbitration proceeding and renounces the work.[31] These *de facto* disputes are real,

[31] *Carpenters Local 1849* v. *C. J. Montag & Sons, Inc.*, 335 F. 2d 216, 221 (CA9 1964); *Bldg. and Construction Trades Council of Las Vegas, Local 525 (Charles J. Dorfman)*, 173 N. L. R. B. 1339 (1968). The Board has also held that a union cannot avoid a § 10 (k) determination by a disclaimer of interest in presently

and they deserve Board resolution if the purposes of § 10 (k) are to be achieved. Cf. *CBS, supra,* at 579–580.

The Court of Appeals would extend the *Safeway* rule to foreclose Board decision where the two unions, but not the employer, have agreed to arbitrate; inter-union agreement was deemed equivalent to effective disclaimer by one of the unions. This view ignores the narrow view the Board has taken of the *Safeway* rule. It also fails to recognize the problem arising where a local union or group of employees continues to do work assigned by the employer despite agreement or disclaimer by their parent body. It makes little difference to the picketing union that there has been a "settlement" or an agreed-upon method of deciding the dispute as long as it is barred from enjoying the results of such a theoretical resolution. In the instant case, the Board held a § 10 (k) hearing for the simple reason that a live unresolved jurisdictional dispute between unions and employer in fact existed.

Our conclusion evinces no hostility to voluntary settlement of disputes and is wholly consistent with federal policy with respect to voluntary arbitration. In other contexts, where challenged conduct poses an arbitrable dispute under a collective-bargaining contract but is also an unfair labor practice within the jurisdiction of the Board, the Board will, as a matter of policy, defer to the arbitral settlement, although it is not bound to do so

representing the employees in question, *United Mine Workers (Turman Construction Co.),* 136 N. L. R. B. 1068 (1962), and it has ignored explicit disclaimers when it has questioned a representative's authority to disclaim work, *Millwrights' Local 1113 (Brogdex Co.),* 157 N. L. R. B. 996, 1002 (1966). See also *Local 1291, Int'l Longshoremen's Assn. (Pocahontas Steamship Co.),* 152 N. L. R. B. 676 (1965), enforced, 368 F. 2d 107 (CA3 1966), cert. denied, 386 U. S. 1033 (1967); *Bricklayers' Local 2,* 152 N. L. R. B. 278, 282 (1965); *Bldg. and Construction Trades Council of Las Vegas, Local 525 (Charles J. Dorfman), supra* (1968).

by the LMRA. See 29 U. S. C. § 160 (a); *Carey* v. *Westinghouse Electric Corp.*, 375 U. S., at 272; *NLRB* v. *Strong*, 393 U. S. 357, 360–361 (1969); *NLRB* v. *Acme Industrial Co.*, 385 U. S. 432, 438 (1967). Although the Board is not statutorily required to honor arbitration awards in such situations, it often defers to them if the arbitrator has considered the alleged unfair labor practice. *Spielberg Mfg. Co.*, 112 N. L. R. B. 1080 (1955); *International Harvester Co.*, 138 N. L. R. B. 923 (1962), enforced *sub nom. Ramsey* v. *NLRB*, 327 F. 2d 784 (CA7 1964). But again, such deference is in the context of voluntary arbitration. In the case before us, the LMRA *requires* that the Board defer only when all of the parties have agreed on a method of settlement; when there has been such an agreement, the Board cannot ignore or override the result of that settlement procedure. In the present cause, however, it is claimed the Board must defer when less than all the parties to the dispute have agreed to arbitrate.

*Reversed.*