**LOCAL 134, INTERNATIONAL BROTH-
ERHOOD OF ELECTRICAL WORK-
ERS, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 72–1822.

United States Court of Appeals,
Seventh Circuit.

Argued April 18, 1973.

Decided Sept. 20, 1973.

Rehearings Denied Nov. 26, 1973.

---

11. Findings of Fact, # 21.

12. Testimony of Begshaw, Muns and Fowler, supra.

**864**

Robert E. Fitzgerald, Jr., Edward J. Calihan, Jr., Matthew E. Murray, Chicago, Ill., for petitioner.

John O'Brien, Washington, D. C., Irving M. Friedman, Chicago, Ill., for intervenor.

Peter G. Nash, Gen. Counsel, Alan D. Cirker, Atty., National Labor Relations Board, Washington, D. C., for respondent.

Before SWYGERT, Chief Judge, and MURRAH* and BARNES,** Circuit Judges.

MURRAH, Circuit Judge.

This is an appeal by a labor union from an order of the National Labor Relations Board (the Board) finding that the union had committed a § 8(b)(4)(D) unfair labor practice in a jurisdictional dispute over installation of telephone equipment. The dispute arose in this way. The Communications Equipment and Systems Division of International Telephone & Telegraph Corporation (the Company) contracted with the Village of Elk Grove, Illinois, to sell, install, test, and maintain a private telephone system for the Elk Grove Village Firehouse and City Administration Offices. This work involved two stages, (1) "pulling cable," i. e., routing the telephone cable to the telephone instruments, and (2) "terminating the cable," that is installing and testing the Private Branch Exchange (PBX) switch system and telephone instruments. The Company subcontracted the "pulling cable" phase to the C. A. Riley Electric Construction Co., whose employees are represented by Local 134, International Brotherhood of Electrical Workers, AFL–CIO (Local 134); the terminating phase was to be accomplished by Company technicians represented by the Communication Workers of America (CWA).

The Local 134 business agent objected to this work assignment, telling Company officials that Local 134 did all telephone and PBX installation and maintenance work in that area, that CWA would not install telephone equipment in Cook County, and that "[w]e'd better get that work or there will be trouble."

When CWA technicians appeared at the job site to begin their assigned work, the Local 134 steward announced to his fellow workers either, "I can't work here" or "we can't work here."[1] He and the other Local 134 employees subsequently left the job site, and none returned until the Company agreed that no CWA employees would be on the site. When the Local 134 employees had finished "pulling" the cable, the CWA workers returned and completed the "terminating" phase.

The Company then filed a charge alleging that Local 134 had violated §§

---

*Senior Judge Alfred P. Murrah of the United States Court of Appeals for the Tenth Circuit sitting by designation.

** Senior Judge Stanley N. Barnes of the United States Court of Appeals for the Ninth Circuit sitting by designation.

1. There is some conflict in the evidence as to his exact words, but the difference is not material.

8(b)(4)(i) and (ii)(D) of the National Labor Relations Act, 29 U.S.C. §§ 158(b)(4)(i) and (ii)(D), which provide in presently material part that it shall be an unfair labor practice for a labor union or its agents to induce or encourage an employee

"(i) . . . to engage in . . . a refusal in the course of his employment to . . . perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is

\* \* \* \* \* \*

"(D) Forcing or requiring any employer to assign particular work to employees in a particular labor organization . . . rather than to employees in another labor organization. . . ."

A hearing on the charge, conducted by a hearing officer in accordance with the provisions of § 10(k) of the Act, 29 U.S.C. § 160(k),[2] resulted in a finding that employees represented by Local 134 were not entitled to the disputed work assignment, and that Local 134 was therefore not entitled to attempt to coerce or force the Company to assign the disputed work to its members. When Local 134 informed the Board's Regional Director of its decision not to acquiesce in the Board's determination, the Regional Director issued this unfair labor practice complaint. Upon a § 10(b) hearing, 29 U.S.C. § 160(b), the Board adopted the § 10(k) findings, and accordingly determined that Local 134 had committed a § 8(b)(4)(D) unfair labor practice.

In this § 10(e) enforcement proceeding, Local 134 takes the position that all of the installation work involved here has customarily been performed by Local 134 and, relying upon Longshoremen and Warehousemen's Local 8 (Waterway Terminals Co.), 185 NLRB No. 35, and the rationale in Woodwork Manufacturers v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), contends that the Board erroneously found in the § 10(k) proceeding that the work should be awarded to CWA. In the Waterway Terminals and other referenced cases the Board, recognizing the concept of customary work assignments, held that § 8(b)(4)(D) was not designed to proscribe union attempts to retrieve the jobs of employees whom the employer had supplanted by reallocating their work to others. Contrary, however, to the position of the union, we do not have a customary work assignment case in which work is usurped from workers of one union by reallocation to workers of another union. Testimony at the § 10(k) hearing clearly indicates that employees represented by CWA customarily install and test equipment similar to that involved here in Cook County, and the Board determined that by area, employer, and industry practice and by skill and training, the CWA employees were more entitled to perform the disputed work than employees of Local 134.

In the Woodwork Manufacturers case a trade association filed a § 8(b)(4)(B) charge, claiming that it was an unfair labor practice for carpenters to refuse to handle pre-cut and pre-fitted doors manufactured by a member of the association. The NLRB dismissed this particular charge (149 NLRB 646), and the Court of Appeals affirmed (354 F.2d 594, 599 (7th Cir. 1965)). The Supreme Court also affirmed, based upon the Board's specific findings to the effect

---

2. Section 10(k), 29 U.S.C. § 160(k), provides that

"[w]henever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practices shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."

that the union's conduct involved only a primary contract dispute with the employer over preservation of job-site work customarily performed by the contracting union, rather than a secondary jurisdictional dispute between two unions, and was therefore not prohibited by § 8(b)(4). The court concluded that, viewed as a whole, § 8(b)(4) was manifestly intended to protect genuinely neutral employers from coercive pressures in disputes not their own; and rationalized that "[t]he prohibition of subsection (D) against coercion to force an employer to assign certain work to one of two unions contesting for it protects the employer trapped between the two claims." 386 U.S. at 625, 87 S.Ct. at 1258. In both *Woodwork Manufacturers* and *Waterway Terminals* the Board and the courts were concerned with the concept of customary work assignments, and simply applied that doctrine to exempt the disputes from the prohibitions of § 8(b)(4).

■ The insurmountable difficulty confronting the union here is that the salient and controlling facts of its case do not fit the facts of the cases upon which it relies. In our case the Company is a party to a collective bargaining agreement with CWA, covering installation operations, pursuant to which the work in question was assigned to CWA. At the § 10(k) hearing it was concluded that "considerations of collective-bargaining history and agreements favor assignment of the work to employees represented by CWA." Unlike the circumstances of *Woodwork Manufacturers* and *Waterway Terminals,* then, the Company assigned the work to CWA in accordance with a current collective bargaining agreement, but was coerced by Local 134 in an attempt to have the work assigned to employees the Local represents. In these circumstances the employer was "trapped" in a jurisdictional dispute between the two contesting unions. Stated another way, the Local 134 activities complained of did not involve a primary dispute with the employer over fulfillment of its contract for work custo-

marily performed, but were secondary pressures designed to influence the employer concerning a jurisdictional union dispute. Such is the very activity § 8(b)(4)(D) was intended to prohibit. 386 U.S. at 625, 87 S.Ct. 1250. *See also* National Labor Relations Board v. Local Union No. 9, 255 F.2d 649 (4th Cir. 1958). We certainly cannot say that the Board's decision was not supported by the controlling facts of the case. *See, e. g.,* NLRB v. Akin Products Co., 209 F. 2d 109 (5th Cir. 1953).

Compliance With the Requirements of the Administrative Procedure Act

■ Local 134 also contends that the Board violated Section 5 of the Administrative Procedure Act, 5 U.S.C. § 554, because the hearing officer in the § 10(k) proceeding subsequently served in a prosecutorial capacity as counsel for the General Counsel at the § 8 Unfair Labor Practice Hearing. Section 554 provides in presently material part that "[a]n employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review. . . ." The avowed purpose of this provision of the Act is to ". . curtail and change the practice of embodying in one person . . . the duties of prosecutor and judge." *See* Wong Yang Sung v. McGrath, 339 U.S. 33, 41, 70 S.Ct. 445, 450, 94 L.Ed. 616 (1950). *See also* Riss & Co., Inc. v. United States, 341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345 (1951). And it is true that in this case the presiding § 10(k) hearing officer also acted as a prosecutor at the Unfair Labor Practice Hearing.

In the Board's view it was not improper for the same person to perform the functions of hearing officer and subsequently prosecute an unfair labor charge based upon the evidence adduced at that hearing, simply because the hearing was without binding effect on anyone. While this is technically so, it

is also true that the hearing officer's rulings at the § 10(k) hearing largely determine what evidence the Board will have to consider at the Unfair Labor Practice Hearing, in which the hearing officer participates as an advocate. It is, we think, an oversimplification to say that the § 10(k) hearing has no binding effect. As Justice White put it in NLRB v. Plasterers' Union, 404 U.S. 116, 126–127, 92 S.Ct. 360, 367, 30 L. Ed.2d 312 (1971),

> ". . . the impact of the § 10(k) decision is felt in the § 8(b)(4)(D) hearing because for all practical purposes the Board's award determines who will prevail in the unfair labor practice proceeding. If the picketing union persists in its conduct despite a § 10(k) decision against it, a § 8(b)(4)(D) complaint issues and the union will likely be found guilty of an unfair labor practice and be ordered to cease and desist. On the other hand, if that union wins the § 10(k) decision and the employer does not comply, the employer's § 8(b)(4)(D) case evaporates and the charges he filed against the picketing union will be dismissed."

The Board also argues that the combination of functions did not violate the Administrative Procedure Act because the hearing officer performed his prosecutorial duties only after he had already presided at the § 10(k) hearing. But, as Justice Jackson cogently observed in *Wong Yang Sung, supra,*

> "[a] genuinely impartial hearing, conducted with critical detachment, is psychologically improbable, if not impossible, when the presiding officer has at once the responsibility of appraising the strength of the case and of seeking to make it as strong as possible. Nor is complete divorce between investigation and hearing possible so long as the presiding inspector has the duty himself of assembling and presenting the results of the investigation." 339 U.S. at 44, 70 S.Ct. at 451.

■ It is apparently admitted that § 554 applies to § 10(k) hearings. And § 556 of the Act provides in presently material part that, in hearings required to be conducted in accordance with § 554, ". . . [t]here shall preside at the taking of the evidence . . . one or more hearing examiners appointed under section 3105 of the title." [3] Section 3105 provides in presently material part that hearing examiners ". . . may not perform duties inconsistent with their duties and responsibilities as hearing examiners." This is, we think, a specific manifestation of the congressional intent that administrative officers who preside at such hearings be completely "isolated," "impartial," and "independent" (*see, e. g.,* 92 Cong.Rec. A-2982 (1946), 92 Cong.Rec. 2160 and 2163 (1946), 20 Fed.B.J. 74–76 (1960), and 27 Fed.B.J. 351 at 362 (1967); that there shall be no "commingling" of the functions of investigation or advocacy with the function of decision making. *See Wong Yang Sung, supra,* 339 U.S. at 44, 70 S.Ct. 445 *quoting* the Attorney General's Committee on Administrative Procedure. "It has been said that hearing examiners are the administrative equivalent of federal judges." [4] Indeed, the title of hearing examiner has recently been changed to "Administrative Law Judge." *That is, see* 37 Fed.Reg. 16787 (No. 162, Aug. 19, 1972).

■ In our case the hearing officer had the duty of hearing the evidence in the case, and subsequently urging and relying upon it as prosecutorial evidence. We think that the knowledge on the part of the presiding officer that he will subsequently advocate a position based upon

---

3. We assume that the § 10(k) hearing officer in this case is the equivalent of a hearing examiner for purposes of § 556, inasmuch as the statute so requires and no point was made of any distinction, either at the hearing or on appeal.

4. *See comments* of Henry S. Sham, NLRB Trial Examiner, at 20 Fed.B.J. 74, 79 (1960), *quoting* Mr. Earl W. Kintner, then Chairman of the Federal Trade Commission.

his own evidentiary rulings at the § 10(k) hearing could very well influence his decisions at that hearing. This commingling of functions is plainly inconsistent with both the spirit and the letter of the Act, and, we think, incompatible with the accepted norms for the proper administration of justice. An order of the Board thus tainted should not be enforced.

Enforcement is accordingly denied.