**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO; Baltimore District Council, International Longshoremen's Association, AFL–CIO; & International Longshoremen's Association, Local 333, AFL–CIO, Respondents.**

**Rukert Terminals Corporation and Beacon Stevedoring Corporation, Intervenor/Petitioner.**

No. 84–1767.

United States Court of Appeals, Fourth Circuit.

Argued April 2, 1985.

Decided June 10, 1985.

are practicable and not unduly burdensome, it may well be that the supplier should be required to adopt them.

Herzl S. Eisenstadt, New York City (Charles R. Goldburg, Thomas W. Gleason, New York City, on brief), for respondents.

Charles P. Donnelly, Washington, D.C., Stephen David Shawe, Baltimore, Md. (Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Peter Winkler, Washington, D.C., on brief), for intervenor/petitioner.

Before HALL, PHILLIPS and CHAPMAN, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge.

This case is before us upon the National Labor Relation Board's application for enforcement of a cease and desist order entered against the International Longshoremen's Association (ILA), its Baltimore District Council, and ILA Local 333, pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C. § 151, *et seq.* We hold that the Board's order requiring the union to refrain from withholding or threatening to withhold labor from intervenor Beacon Stevedoring Corp. in an attempt to coerce intervenor Rukert Terminals Corp. to reassign operation of a dockside crane in the Port of Baltimore to union workers is free of legal error and is supported by substantial evidence. Accordingly, we enforce the Board's order.

I

This case arose in early 1981 when Rukert Terminals decided to erect a crane to load and unload bulk cargoes at its Baltimore facility. Before that time, Rukert Terminals had contracted for the use of a crane owned by Canton Cottman Company and operated by nonunion Cottman employees. In February 1981 Norman Rukert, Jr., president of Rukert Terminals and an officer of Rukert Marine Corp., a stevedoring company, wrote officials of Local 333 that Rukert Terminals planned to use nonunion employees to operate the crane, as was the custom in the port of Baltimore. For some unexplained reason, however, the letter was written on Rukert Marine stationery, leading Local 333 to believe that Rukert was acting on behalf of Rukert Marine, a member of the Steamship Trade Association (STA) and signatory to a labor referral agreement with Local 333. Rukert Terminals was not a member of the STA nor a signatory to the STA–ILA agreement.

Over the course of the spring and summer of 1981, Rukert met with representatives of the local and the district council concerning the crane. Because of its belief that Rukert Marine was erecting the crane the council took the position that Local 333 had jurisdiction over the work and strenuously objected to any plan to operate the crane with nonunion personnel. The union, however, did not lodge any sort of grievance with the STA in an attempt to arbitrate the matter.

In December 1981, Rukert met with Garris McFadden, the incoming president of Local 333. At that meeting, Rukert assured McFadden that Rukert Terminals would own and operate the crane and took

the position that no agreement required Rukert Terminals to employ union labor on the job. Based on those representations, McFadden acquiesced in Rukert Terminals' plan to operate the crane. McFadden later retracted that acquiescence in March 1982, citing orders from the International union vice president and the district council member John Kopp. In April 1982, the crane was completed and certified for use.

In the interim between Rukert's first approach to Local 333 and the completion of the crane, Rukert Marine ceased its stevedoring operations. In July 1981 Norman Rukert, Jr., his sister, and his cousins, George Nixon, Jr., and Nick Nixon formed Beacon Stevedoring Corp. Beacon leased office facilities from Rukert Terminals and contracted with Rukert Terminals for bookkeeping services and the use of pier facilities as they were needed. In September 1981 Beacon joined the STA and became bound by the STA–ILA agreement requiring Beacon to obtain labor from Local 333 for its longshoring operations.

The budding dispute came to a head in April 1982. Rukert Terminals informed Beacon of the impending arrival of the LOVELAND 8 at its pier 5 facilities, and Beacon contracted with the LOVELAND 8 to unload its cargo. Beacon further contracted with Rukert Terminals for the use of the crane. On April 26 McFadden informed Rukert Terminals that he would not allow longshoremen to be dispatched to Beacon if the crane were operated by non-union labor. On April 27 Norman Rukert, Jr. contacted the dispatch center to obtain longshoremen and was told that McFadden and ILA vice president John Kopp would not permit referral because of the dispute over the crane.

Rukert Terminals and Beacon then filed an unfair labor practice charge with the Board pursuant to § 8(b)(4)(D) and § 10(k) of the National Labor Relations Act, 29 U.S.C. § 160(k). The union countered by filing a grievance with the STA, which ultimately ruled that Rukert Terminals was not bound by the STA–ILA agreement and could assign operation of the crane to non-union labor.

After a multi-day hearing in June 1982, the Board issued a Decision and Determination of Dispute holding that there was reasonable cause to believe that the union had violated § 8(b)(4)(D) of the National Labor Relations Act by refusing to dispatch labor to Beacon. It further determined that Beacon and Rukert Terminals were separate corporate entities and that Rukert Terminals was therefore not obligated to assign the work to union labor.

Under the procedural scheme fashioned by the Board, the unfair labor practices charges were held in abeyance pending ILA's acceptance of the jurisdictional dispute resolution and acknowledgment of its intent to refrain from conduct proscribed by § 8(b)(4)(D). ILA did not respond to the Board's decision; thus the General Counsel for the Board issued a § 8(b)(4)(D) complaint against the union. In March 1984, in the absence of any further evidence from the union, the Board entered judgment against the union on the basis of the record developed in the June 1982 § 10(k) proceeding, and ordered the union to cease and desist from the § 8(b)(4)(D) prohibited activity. This petition followed.

## II

The respondents stake their case on the assertion that Board proceedings were improper from the outset because there was no jurisdictional dispute to be resolved. Underlying this argument is the contention that Beacon and Rukert Terminals were in effect one and the same company for the purpose of assigning crane operators under the STA–ILA agreement. The Board rejected the latter contention, and we find that ruling to be supported by the evidence. Regardless of that ruling, however, we hold that the Board had jurisdiction to conduct the § 10(k) proceeding.

Section 10(k) authorizes the Board to hear and resolve disputes that have en-

gendered unfair practices charges.[1] The purpose of the § 10(k) proceeding is not to determine whether one of the parties has actually committed an unfair labor practice, but rather to induce party conciliation of the dispute and thereby avoid the necessity to determine whether the unfair practice has occurred. But where voluntary adjustment does not occur, the Board is empowered by § 10(k) to determine the underlying dispute. In the context of a § 8(b)(4)(D) charge, this involves determining who is entitled to the contested work, because "[o]n its face, the section would appear to cover any union challenge to an employer work assignment where the prohibited [by § 8(b)(4)(D)] means are employed." *NLRB v. Plasterer's Local Union No. 79*, 404 U.S. 116, 123, 92 S.Ct. 360, 365, 30 L.Ed.2d 312 (1971) (citing *NLRB v. Radio & Television Broadcast Engineers Union, Local 1212*, 364 U.S. 573, 576, 81 S.Ct. 330, 332, 5 L.Ed.2d 302 (1961)).

 The union's contention that Rukert Terminals and Beacon Stevedoring were the same company and therefore Rukert was contractually bound to assign the work to Local 333 did not remove the dispute from § 10(k) adjudication. The essence of a jurisdictional dispute is that a union claims a right to work that is being performed by workers who may or may not be represented by another union. *See*

*NLRB v. Radio & Broadcast Engineers Union, Local 1212*, 364 U.S. at 579, 582, 81 S.Ct. at 334, 336. A union with a valid contract right to the work may avoid a § 10(k) proceeding if the employer has been determined by the Board to be obligated to assign the work to the union employees.[2] In this case, however, no Board certification had been issued against either Beacon or Rukert Terminals in regard to the operation of the crane. Thus, dismissal of the § 10(k) proceeding under the last clause of § 8(b)(4)(D) would have been improper. A determination that Beacon and Rupert Terminals were either alter ego companies, a single employer, or a joint employer, as argued by the union could only have affected the resolution of the merits of the dispute. It could have no effect on the Board's power to determine the work assignment dispute.

### III

Review on the merits of the order requires two inquiries: (1) whether the Board's decision that Local 333 was not entitled to the work is supported by substantial evidence and (2) whether the Board's factual determination that the union engaged in prohibited activity is supported by substantial evidence.

 In determining the award of the work, the Board properly considered a

---

1. Section 10(k) of the National Labor Relations Act, 29 U.S.C. § 160(k) states:

 Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment, of the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

2. Section 8(b)(4)(D) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(D) states:

 (b) It shall be an unfair labor practice for a labor organization or its agents—

 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

 (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, *unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.* (Emphasis added.)

number of factors: whether collective bargaining agreements between Rukert Terminals and the union provided for union operation of a shoreside crane, whether a corporate relationship between Beacon and Rukert Terminals imposed obligations on Rukert by virtue of collective bargaining agreements between Beacon and the union, whether past practices by Rukert Terminals and other area employers in regard to crane operation affected assignment of operation of this particular crane, and whether nonunion employees could more efficiently operate the crane.[3] Upon the record as a whole, we find that the award to Rukert's nonunion employees was supported by substantial evidence.

■ It is uncontradicted that Rukert Terminals had no collective bargaining agreement with Local 333. As noted earlier, the union asserts that Beacon's agreement should have applied to Rukert Terminals because the two companies were so interrelated as to be alter egos, a single employer, or joint employers. We affirm the Board's determination to the contrary.

Though Norman Rukert, Jr. and George Nixon, Jr. were involved in both companies, ownership of the two companies was distinctly separate—Rukert Terminals was owned by a trust controlled by Norman Rukert, Sr. and his sister while Beacon was owned by Rukert, Jr., his sister, and George Nixon, Jr. Rukert, Jr. was primarily responsible for managing Beacon and his management involvement in Rukert Terminals was subordinate to that of Rukert, Sr. who was chairman of the board and chief executive officer. There was no evidence that the operations of the two companies were functionally integrated.

Though no one factor is dispositive, a strongly probative finding in this case was that control of labor relations was separate as between the two companies. Testimony in the record established that Rukert, Sr. had the final authority over personnel matters for Rukert Terminals, and because the company was not a member of the STA,

labor grievances were handled directly with Rukert Terminals' management. Beacon, on the other hand, vested control of its labor relations in Rukert, Jr. who in turn was governed by the STA–ILA agreement's grievance procedures.

Finally, the record does not reflect that Beacon exercised any control over the employees operating the crane. The contract with Rukert Terminals expressly states that Rukert Terminals shall provide the crane operators and that those operators would have complete control over the manner in which the crane was operated. Therefore, we find no basis for the union's contention that Beacon should be considered a joint employer of those operators.

We see no point in retracing the remainder of the Board's inquiry in any detail. The record amply supports the Board's finding that the practice in the port of Baltimore was for companies owning shoreside cranes to operate them with their own employees. The practice was undoubtedly established because of the efficiency in having specially trained operators who possessed the skill necessary not only to operate the crane but to perform repair work as well, another factor established by the record to support the Board's order.

## IV

■ The Board's finding that the union withheld or threatened to withhold labor from Beacon is likewise supported by substantial evidence. Blair Browne of the STA testified that ILA Vice President Kopp told him that he would not permit labor to be dispatched to Beacon if the crane were not operated by ILA personnel. Brown reminded the dispatcher, one Buck Jones, that he was obligated to post all orders for labor, to which Jones replied that Kopp and McFadden had told him not to dispatch labor to Beacon.

Norman Rukert, Jr. testified that McFadden called him concerning Beacon's plans to unload the LOVELAND 8 with Local

3. *Cf. NLRB v. Plasterer's Local Union No. 79,* 404 U.S. at 132 n. 26, 92 S.Ct. at 370 n. 26 (stating Board guidelines for resolving jurisdictional disputes).

333 longshoremen and non-ILA crane operators. McFadden stated that if Beacon attempted to carry out its plans, he, McFadden, would "shut down [Beacon's] operations." Rukert testified that he received a similar call from Kopp who stated that "we are going to withhold labor from you." Finally Rukert testified that he placed his order with the dispatch center, only to receive a call from Jones who stated that on orders from McFadden and Kopp, he was to withhold labor from Beacon.

Richard Wolf, a vice president for Rukert Terminals, testified that he was asked to listen on his extension to the call from Jones. He reiterated Rukert's testimony that Jones refused to dispatch labor for the LOVELAND 8.

 Jones, McFadden, and Kopp all testified that they never refused to provide labor for Beacon and that neither Kopp nor McFadden had authority to give Jones such an order. It is within the Board's province to resolve conflicts in the testimony. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). Here the hearing examiner credited the testimony of the intervenors to find that the union in fact withheld or threatened to withhold labor. The standard of review for this court is whether the evidence supporting that finding is substantial, and we hold that it is.

### V

 We find no merit to the ILA's assertion that the Board's order should not be enforced against it. The record reflects that ILA vice-president John Kopp was actively involved in the whole matter in dispute. Furthermore, Rukert, Jr. testified that the hiring hall dispatcher cited orders from both Kopp and McFadden to refuse dispatching laborers. While Kopp was a member of the district council, his capacity as an ILA officer gave the appearance of international union authority to his actions. Therefore, the Board's conclusion that the ILA was effectively involved in the dispute has support in the record.

We find that the cease and desist order was founded upon substantial evidence and free of legal error. Accordingly, the order is enforced.

ENFORCED.