**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GENERAC CORPORATION, Respondent.**

**No. 15128.**

United States Court of Appeals Seventh Circuit.

Dec. 15, 1965.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Elliott Moore, Atty., National Labor Relations Board.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Jules H. Gordon, Atty., N.L.R.B., Washington, D. C., for petitioner.

O. S. Hoebreckx, Milwaukee, Wis., for respondent.

Before DUFFY and SWYGERT, Circuit Judges, and MERCER, District Judge.

SWYGERT, Circuit Judge.

The National Labor Relations Board has petitioned for enforcement of an order directed against the Generac Corporation, whose principal place of business is in Genesee, Wisconsin. The Board's order was based upon its finding that Generac had violated section 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1), by threatening reprisals and promising benefits to employees in connection with a Board-conducted representation election, and that Generac had also violated section 8(a) (5) of the act, 29 U.S.C. § 158(a) (5), by refusing to bargain in good faith with the union certified as a result of the election.[1] The Board's decision is reported at 149 N.L. R.B. No. 85. Generac does not contest the enforcement of that portion of the order relating to a violation of section 8(a) (1). The question presented here is, therefore, whether substantial evidence exists in the record taken as a whole to support the Board's conclusion that Generac improperly refused to bargain with the certified union.

The facts are largely undisputed. All material events occurred in 1963 at the Genesee plant. Union organizational activities began sometime in March and continued until the union was victorious in a Board-conducted election on June 5.[2]

The union was formally certified as the bargaining agent for Generac employees on June 14. On the same day, without notice to the union, the company posted an announcement on the plant bulletin board. The announcement read in part:

In order to bring our production into a more realistic relationship to our sales, it is necessary, effective Monday, June 17, 1963 to temporarily reduce our work schedule. Your foreman has the details and will inform you today as to what the revised schedule will be for your specific department.

Fifteen employees were affected by this notice, four being laid off for a short time and the remaining eleven experiencing a reduction in working hours from eight to seven per day, for periods ranging generally from two to three weeks. This was the first work reduction affecting any substantial number of employees during the then three-year existence of the company. The trial examiner cited the company's failure to consult with the union prior to posting the notice as evidence of a refusal to bargain in good faith. The Board, however, concluded that this event constituted an independent violation of section 8(a) (5), and included in its order a command that the employees affected be made whole for any loss of wages resulting from the work reduction.[3]

Following the submission of a written contract proposal by the union, negotiating sessions commenced on July 16. The company's counter-proposal was submitted on August 16. Several sessions were

1. District Lodge No. 48, International Association of Machinists, AFL-CIO.

2. The acts of the company found to constitute a violation of section 8(a) (1), not contested here, took place during this period.

3. Board member Leedom dissented on this point, asserting that the company had no obligation to bargain with the union concerning these temporary work reductions since they involved, in his view, day-to-day management decisions.

subsequently held, but no agreement was reached. At these meetings the company, *inter alia,* insisted upon the right to install and discontinue an incentive compensation plan whereby it could, at its pleasure, increase the earnings of employees as much as fifteen per cent. The company refused the request of the union to discuss the specific terms of such a plan. The company also insisted upon a contract clause freeing it from the obligation to negotiate on any subject other than grievances during the term of the contract, whether or not such subject was discussed during the bargaining sessions.

At the session held on September 30, the union agreed to the company's request that the company's written proposal be submitted to the union membership. The union requested, however, that the proposal be submitted to it "for checking" prior to distribution to the employees. On October 3, copies of the proposal were distributed to the union and the employees simultaneously. The accompanying letter stated in part:

> Attached to this letter is the Company's contract proposal to our employees including the wage section.
>
> \* \* \* \* \* \*
>
> WAGE INCREASE: An across the board minimum wage increase of 5 cents per hour has been offered for *everyone.* \* \* \*
>
> We think you will agree that the above twelve new features, plus the wage increase, represents (sic) an equitable proposal for everyone.
>
> Please feel free to discuss with us any questions you may have concerning this proposal.

Meanwhile, on October 2, the company had been served with copies of a complaint issued by the Board pursuant to unfair labor practice charges, including a section 8(a) (5) charge, filed earlier by the union. On October 8, the company responded with a letter noting its disappointment, in view of its bargaining efforts to that date. The letter concluded:

> If, despite these efforts, we are still to be charged with refusing to bargain, there would seem to be no point in continuing negotiations until it is determined whether such negotiations constitute a refusal to bargain. Moreover, the litigation which the NLRB complaint involves can hardly contribute to a union-management relationship necessary for successful contract negotiations.
>
> In any event, the time between now and the hearing on October 28 will have to be spent preparing our defense to these charges. If in the meantime you have any new proposal to submit, we suggest that you do so in writing and we will make appropriate response. The Company has no additional proposals to make at this time.

The union did not submit any written proposals thereafter. The Board hearing was eventually rescheduled for December 2.

On November 22, the company posted a notice and mailed a letter to the union indicating that the plant would be closed on Friday, November 29, the day after Thanksgiving, "[s]o that our employees might enjoy a long Thanksgiving Holiday week end." The topic was discussed at a grievance meeting three days later, but the one-day shutdown was effected. The Board concluded that this action also constituted an independent violation of section 8(a) (5), and ordered employee restitution therefor.

Finally, on November 26, the company mailed a letter to the union, with copies to all employees, containing the following language:

> On October 3rd the Company offered to increase all wage rates a minimum of five cents per hour. Also on that date, we submitted a draft of our proposal for a complete labor agreement. We have not heard from you in the past seven weeks relative to the acceptance or rejection of our proposals.

The Company in past years has been successful in making wage increases during the mid-summer months. This pattern was disrupted this year due to union contract negotiations. We feel, however, that our employees are entitled to better treatment than this and that there is no justification for further postponing the wage increase we have offered.

We therefore propose to put the October 3rd wage offer into effect as of December 2, 1963. This proposal is not intended to close wage rates as a matter for future negotiations. If you have any objection to this action, please advise me promptly.

We are convinced that the foregoing circumstances when considered in their entirety provide ample support for the Board's finding of a section 8(a)(5) violation. The timing and nature of the June 14 work-reduction announcement, the uncompromising attitude of the company taken at the bargaining table, the temporary breaking off of contract negotiations in feigned surprise at being accused of unfair labor practices,[4] the company's announcement a few days before the Board hearing of a five cent hourly increase effective on December 2—all serve to show the company's unwillingness to comply either with the spirit or the letter of section 8(a)(5).

The unilateral increase in pay is perhaps the most glaring example of lack of good faith on the part of the company. Although the letter dated November 26 was addressed to the union business representative, copies were sent to all the employees. In this letter the company referred to the fact that on October 3 it had offered to increase all wage rates five cents per hour. The letter continued, "We have not heard from you in the past several weeks relative to the acceptance or rejection of our proposals." This statement was made in the face of the company's statement of October 8 that "there would seem to be no point in con-

tinuing to bargain" until after the unfair labor practice hearing. The letter also referred to the fact that in the past the company had granted wage increases during the summer months but that the "union contract negotiations" had "disrupted" the "pattern." The letter added, "We feel, however, that our employees are entitled to better treatment than this. * * *" These circumstances make applicable what we said in Inland Lime & Stone Co. v. N.L.R.B., 119 F.2d 20, 22 (7th Cir. 1941): "This action was more than merely tactless. It evidenced a wilful and deliberate contempt for the whole plan of collective bargaining. It was fairly inferable that the employer, by this action, intended to humiliate the Union representatives and discredit them in the eyes of their fellow employees. It reflected on the alleged good faith of [the employer's] recognition of the Union as a bargaining agent."

Good faith bargaining must be evinced by more than superficial efforts to negotiate a wage agreement. Good faith means sincerity, candor, and a willingness to negotiate toward the possibility of effecting compromises. It does not connote stubbornness, or efforts to cast upon the union the onus of delay which the company itself caused, or unilateral action increasing wages during the negotiating period. Actions which may have the appearance of good faith cannot hide the lack thereof if they are actually designed to weaken the possibility of an eventual agreement.

We do not agree with the Board, however, that the temporary layoffs and hourly reductions of June 14 and the layoff of November 29 constituted independent violations of section 8(a)(5).

The cutback in production hours of June 14 does fit the general pattern of the company's lack of good faith bargaining. The reduction was announced on the same day that the union was formally certified and without notice to it. However, the parties had not yet entered con-

---

4. The trial examiner noted that the company had been served with an unfair labor practice charge in July and an amended charge in August.

tract negotiations, nor had the union requested a bargaining session. The cutback itself was essentially a day-to-day management decision. It is uncontradicted that the company's man-hours exceeded its production requirements at that time; and, although the number of employees affected was stipulated as being significant, the work reduction was relatively small in terms of duration and actual time loss. Under these circumstances, the incident standing alone did not amount to a refusal to bargain.

 Nor do we believe that the November 29 layoff of itself violated section 8(a) (5). The Board does not contest the employer's right to take such action. It contends, rather, that the union was not afforded an adequate opportunity to negotiate with respect to the layoff. The letter indicating the company's fixed intention to effect the plant shutdown was mailed a week prior to the scheduled closing. Despite the fact that the employees may have learned of the prospective layoff in advance of the union's receipt of the letter, the union had an opportunity to, and at a November 25 grievance meeting did, discuss the matter.

Contrary to the Board's interpretation, the fact that the motivation for the shutdown may have been economic rather than the expressed solicitude for the employees' well being, we think, is of little importance. Similarly unpersuasive is the Board's argument relating to the significance of the post-Thanksgiving layoff as a "drastic" change in company policy. The company was in its third year of operation. In short, while the obviously recalcitrant attitude of the company in all aspects of its relationship with the union may not be condoned, there is not sufficient evidence to establish the one-day layoff as an independent refusal to bargain within the meaning of section 8(a) (5).

That portion of the Board order concerning the alleged independent violations of section 8(a) (5) and ordering employee restitution therefor is vacated. The order as modified will be enforced.