**ASSOCIATED GENERAL CONTRACTORS OF AMERICA, EVANSVILLE CHAPTER, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL UNION NO. 103, INT'L ASS'N OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS, etc., et al., Respondents.**

Nos. 71–1480, 71–1575.

United States Court of Appeals, Seventh Circuit.

Argued April 4, 1972.

Decided July 17, 1972.

Rehearing Denied Sept. 15, 1972.

---

5. The motion to dismiss the appeal was abandoned and is denied since plaintiff did file the requisite cost bon.

Winthrop A. Johns, Lawrence T. Zimmerman, Washington, D. C., Joseph A. Yocum, Evansville, Ind., Kenneth J. Clerk for Associated Gen. Contractors of America, and Local Union No. 103; Johns & Zimmerman, Washington, D. C., of counsel.

Sydney L. Berger, Evansville, Ind., for Local Union No. 103 and Charles Tremper.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore and Julius Rosenbaum, Attys., N.L.R.B., Washington, D. C., Peter G. Nash, Gen. Counsel, for N.L.R.B.

Before CUMMINGS and STEVENS, Circuit Judges, and CAMPBELL, Senior District Judge.[1]

CUMMINGS, Circuit Judge.

The first of these cases arises on the petition of Associated General Contractors of America, Evansville Chapter, Inc. ("Association") to review the Board's order reported in 190 NLRB No. 145. The other case comes here upon the Board's petition to enforce the order. In the Labor Board proceedings, the Association was the charging party. It is a corporation comprised of employers engaged in the building and construction industry, and it represents them in collective bargaining with labor organizations, including the Iron Workers' Union.[2]

Over the years, the Association has negotiated collective bargaining contracts with the Union, and these contracts have been adopted by its employer-members as well as non-member contractors employing iron workers in the Evansville, Indiana, area. The most recent contract between the Association and Union was in effect from April 1, 1967, to March 31, 1970, and Article VIII thereof carried forward a previous contractual provision requiring the submission of jurisdictional disputes to the National Joint Board for the Settlement of Jurisdictional Disputes ("National Joint Board"). The National Joint Board was comprised of an equal number of employer and union designates under the chairmanship of an impartial member. The Association and the Union were then represented on the National Joint Board through their parent organizations.[3]

The National Joint Board was dissolved in September 1969. The Association then advised Charles Tremper, the Union's Business Agent, that the Association and its parent would not be parties to any agreement establishing a new joint board, nor did they agree to participate in the Interim Joint Board which was formed in late 1969 to replace the National Joint Board. On the ground that its parent would not permit the Local to be a party to an area board, the Union refused to discuss an Evansville facility to settle jurisdictional disputes, as suggested by the Association.

In February 1970, the Association and Union began to negotiate a new contract. They discussed Article VIII of the previous contract. That article, dealing with craft jurisdiction, provided:

"It is agreed that the jurisdiction of work covered by this Agreement is that provided for in the Charter Grant issued by the American Federa-

---

1. Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

2. Local Union 103, International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO.

3. Associated General Contractors of America, Inc. and the International Association of Bridge, Structural and Ornamental Iron Workers.

tion of Labor to the International Association of Bridge, Structural and Ornamental Iron Workers, it being understood that the claims are subject to Trade Agreements and final decisions of the AFL–CIO, as well as the decisions rendered by the National Joint Board for the Settlement of Jurisdictional Disputes.

"The parties to this Agreement are subject to and agree to be bound by all decisions and awards made by the National Joint Board for Settlement of Jurisdictional Disputes with respect to all jurisdictional disputes which may arise under this Agreement."

The Association informed the Union that it would not agree to such an article in the new contract because the National Joint Board had been dissolved and the Association's parent was not a party to the Interim Joint Board. In turn, the Union told the Association that the contract would have to provide for the resolution of jurisdictional disputes by the Interim Joint Board or its successor.[4] The Association's alternative was that in the event of a jurisdictional dispute, local representatives of the parties would meet to settle it, or if the Association's parent and the Building and Construction Trade Department, AFL–CIO, agreed to a voluntary plan for the settlement of jurisdictional disputes, the plan would be effective immediately as to the Association and the Union. At subsequent negotiating sessions, the Union insisted on the Association's submitting to the Interim Joint Board or the new National Joint Board, whereas the Association opposed such a provision because its parent was not a party thereto. On March 31, 1970, the parties agreed that they had reached an impasse with respect to this subject, and the collective bargaining contract expired at midnight. The next morning the Asso-

ciation's member employers were struck by the Union, and the work stoppages were still in effect at the time of the July 7, 1970, hearing before the trial examiner.

After the strikes had occurred, various meetings were held by the parties, but they again could not agree on the jurisdictional dispute issue. At one of these meetings, the Union offered a "substitute" for the former provision providing for the settlement of jurisdictional disputes by the National Joint Board, but the substitute was substantially identical to Article VIII.[5] The Association therefore refused to accept it and offered various counter-proposals that were refused by the Union.

On April 29, 1970, the local Building and Construction Trades Council, chaired by Union Business Agent Tremper, passed a resolution insisting that its affiliates and all contractors must abide by the decisions of the new National Joint Board that had been formed that month without Association representation. The resolution was adopted to cause the Association to agree to the National Joint Board method of resolving jurisdictional disputes. On May 14, 1970, Tremper told the press that the issue of the National Joint Board for the settlement of jurisdictional disputes was more important than money, and that the iron workers had not yet discussed wage issues with the Association. Wages were eventually discussed at the final negotiating meeting on June 29, 1970, but the Association's offer of a wage increase was rejected by the Union.

The Trial Examiner concluded that the Union's bargaining to the point of impasse and then striking to compel the Association "to agree that any jurisdictional disputes be resolved by a board on which the [Association] * * * had no representation" contravened Section

4. Effective April 3, 1970, the Interim Joint Board was replaced by a new National Joint Board. On this board, another employers' organization signatory succeeded to the position formerly held by the Asso-

ciation's parent on the old National Joint Board.

5. See note 19, *infra*.

8(b) (1) (B) of the Act (29 U.S.C. § 158(b) (1) (B)), making it an unfair labor practice for a labor organization to restrain or coerce an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances. He also concluded that the Union's insistence on the inclusion of a provision in the collective bargaining agreement for the resolution of jurisdictional disputes by the Interim Joint Board or the new National Joint Board violated Section 8(b) (3) of the National Labor Relations Act (29 U.S.C. § 158(b) (3)), making it an unfair labor practice for a labor organization to refuse to bargain collectively with an employer, because such a provision was a non-mandatory subject to collective bargaining.[6] In contrast, the Board found that the Union's demand was a mandatory subject for bargaining and that the Union's insistence upon it and striking for it did not violate Section 8(b) (1) (B). However, the Board concluded that the Union's position on this subject was not open-minded but was fixed and inflexible and contrary to its duty to bargain in good faith and therefore constituted an unfair labor practice under Section 8(b) (3). Accordingly, the Union and its business agent were required to cease and desist from refusing to bargain with the Association with regard to the resolution of jurisdictional disputes, and the Union was ordered to notify the Association that "it will not refuse to bargain [with the Association] on the resolution of jurisdictional disputes," and to post notices to this effect. In dissenting in part, two of the five Board members expressed the view that Section 8(b) (1)

(B) had been violated, whether or not the proposal for submission of jurisdictional disputes to the Interim or new National Joint Boards was a mandatory subject of bargaining.

*Sections 8(b) (1) (B) Violation*

■ As shown, the Trial Examiner found that the Union had restrained or coerced an employer in the selection of his representatives for the purpose of collective bargaining or the adjustment of grievances in violation of Section 8(b) (1) (B) by "bargaining to the point of impasse and then striking to compel it [Association] * * * to agree that any jurisdictional disputes be resolved by a board" on which none of the management representatives was chosen or designated by the Association. In agreement with the Trial Examiner and with the two dissenting members of the Labor Board, we hold that Section 8(b) (1) (B) was violated by this demand.

■ The statutory phrase "adjustment of grievances" is clearly broad enough to include adjusting jurisdictional disputes.[7] Nothing in the statute or its history demonstrates that Congress intended to tolerate coercing the designation of adjustment representatives not of the employer's own choosing where the subject matter of the grievance happens to be a jurisdictional one. Neither the Board nor the Union has shown why "adjustment of grievances" encompassed by the Section should be interpreted to exclude the adjustment of jurisdictional disputes. Jurisdictional disputes are distinct because they are at least three-cornered rather than bilateral and because they involve conflicting work

6. Although the Board interpreted the Trial Examiner's decision as holding that the entire subject of the mechanism for the resolution of jurisdictional disputes was non-mandatory (190 NLRB No. 145 at p. 4), it appears that the Trial Examiner merely decided that by insisting on the proposal that jurisdictional disputes be settled by a tripartite board on which the Association had no representation, conduct he had found violative of Section 8(b) (1)

(B), the Union was insisting on a non-mandatory bargaining subject.

7. Section 8(b) (1) (B) provides:
 "It shall be unfair labor practice for a labor organization or its agents—
 "(1) to restrain or coerce * * * (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." (29 U.S.C. § 158(b) (1) (B))

claims between unions rather than some other controversy. However, neither of these differences is relevant to the interpretation of "adjustment of grievances." What is relevant is that jurisdictional disputes involve actual labor grievances in which the employer may be vitally interested and to which he is a party. See National Labor Relations Board v. Plasterers' Union, 404 U.S. 116, 92 S.Ct. 360, 30 L.Ed.2d 312; Lathers Union Local 104, 186 NLRB No. 70 at p. 8. The employer's presence may indeed contribute toward a particular resolution of the work jurisdiction dispute. He should be just as entitled to make his presence felt through representatives of his choice in the adjustment of this type of grievance as he is in any other.

■ The Board principally argues that Section 8(b) (1) (B) was not violated because the Association was not coerced in the selection of its "representatives" within the meaning of the statute. Here the Association was unwilling to submit to a tripartite Joint Board on which neither the Association nor its parent was represented. For the reasons which will follow we cannot accept the Board's position that the management members of a tripartite arbitration panel are not "representatives" of the employer within the scope of Section 8(b) (1) (B).

The Labor Board's claim that the employer and union members of the Joint Board are not "representatives" of the party designating them is belied by the very nomenclature of the plan in question. Article II, Section 2, paragraph 2 provides for "four regular and four alternate employer members, who shall be *representatives of* and selected by the Participating Contractors' Employers' Associations." [8] Article II, Section 3, states: "It is understood that in signing this agreement the parties agree to bear their appropriate share of the Joint Board's expense and to furnish *their representatives* on the Joint Board and

Hearing Panels hereinafter provided for this agreement." [9] Certainly the words of Section 8(b) (1) (B) must be accorded their plain common-sense meaning. Thus unless there is some reason to suppose that "representative" as used in the plan carries a meaning other than its ordinary one, the employer members of the tripartite Joint Board should be considered his "representatives" within the meaning of Section 8(b) (1) (B).

Surely the parties to the Joint Board plan cannot be supposed to have endowed "representative" with a meaning other than its natural intendment. As the New York Court of Appeals has succinctly put it, "In fact, the very reason each of the parties contracts for the choice of his own arbitrator is to make certain that his 'side' will, in a sense, be represented on the tribunal." Astoria Medical Group v. Health Ins. Plan of Greater New York, 11 N.Y.2d 128, 227 N.Y.S.2d 401, 405, 182 N.E.2d 85 (1962). This is as true for the employers signatory to the Joint Board Plan as for the unions participating in it. The Supreme Court's recent opinion in National Labor Relations Board v. Plasterers' Union, 404 U.S. 116, 125, 92 S.Ct. 360, 30 L.Ed.2d 312, emphasized the intense concern and substantial stakes employers may have in the resolution of work jurisdiction disputes. Because of their justifiable interest, the employers must have intended that the board members they designate as their representatives actually advocate their viewpoints in resolving particular jurisdictional disputes.

■ The Labor Board characterized the tripartite Joint Board as "more in the nature of an umpire or knowledgeable arbitration panel" and thus concluded that its members should not be considered representatives. Whatever validity that blanket characterization might have as applied to the collective Joint Board, only the Chairman is truly

---

8. Quoted in the *amicus* brief of the parent Association at p. 9; emphasis supplied.

9. *Id.*

impartial.[10] We would be closing our eyes to the realities of labor life if we did not recognize that the employer members would be expected to espouse the viewpoint of the employer party, whereas the union members would be expected to represent the viewpoint of the union party. In truth, the management and union representatives on a tripartite board are actually advocates for the respective parties even though, as here, the parties themselves may not participate in the decision by the tripartite body. As the Committee on Ethics of the National Academy of Arbitrators has stated, "It is common knowledge that the members [of tripartite boards of arbitration] designated by the parties almost invariably view the cases as partisans, though purporting to sit as impartial judges * * *."[11] Thus the partisan members of such boards will attempt to ensure that the neutral chairman understands the positions of the respective parties they represent and the virtues of those positions before he prepares the award. Such members will then ordinarily concur or dissent, depending upon whether or not the decision is favorable to their side.[12] Moreover, it would take an extreme naïveté about tripartite arbitration to believe that the partisan members will never attempt to reach a compromise solution after the dispute has been submitted to the panel.[13] Consequently, the majority of the Labor Board is wrong in treating the Union's demand here as for an "umpire" rather than for the acceptance of management representatives not of the Association's choosing.

Finally, as the dissenting Board members persuasively stated:

"[I]t is fundamental that the party to any dispute or grievance be accorded the right to appoint his own representative if the voluntary settlement procedures they may agree upon are to maintain their efficacy. Therefore, in our view, it is irrelevant whether the designees being forced upon the employer are fair and impartial, for Section 8(b) (1) (B) protects the employer's right to select his own representatives for such purposes."

In summary then, in our judgment, Section 8(b) (1) (B) prohibits a union from compelling a group of employers to accept a new tripartite tribunal to adjust jurisdictional grievances where, as here, they have no representative on the tribunal and did not participate in its formation. See Federated Employers of Nevada, Inc., 135 NLRB 462 (1962);[14] Roofers Local 220 (Jones

10. The Joint Board Plan itself refers to the Chairman as the "impartial" chairman (Art II, Sec. 1), and to the "impartial umpire" on the Appeals Board (Art. II, Sec. 5). Quoted in the *amicus* brief of the parent Association at p. 10.

11. "Standards of Conduct for Labor Arbitrators," The Profession of Labor Arbitration, Selected Proceedings of the First Seven Annual Meetings, National Academy of Arbitrators, 143–44 (J. McKelvey ed. 1957). See Federated Employers of Nevada, Inc., 135 NLRB 462, 470 (1962); United Ass'n of Journeymen, and Apprentices of Plumbing and Pipe Fitting Industry of United States and Canada, Local Union No. 525, Las Vegas v. Eighth Judicial Dist. Ct. of Nevada, 82 Nev. 103, 412 P.2d 352, 354 (1966); Astoria Medical Group v. Health Ins. Plan of Greater New York, 11 N.Y.2d 128, 227 N.Y.S.2d 401, 404–405, 182 N.E.2d 85 (1962); West Towns Bus Co.

v. Division 241 Amalgamated Ass'n of Street Elect. Ry. & Motor Coach Employees, 26 Ill.App.2d 398, 408–409, 168 N.E.2d 473 (1960); Note, The Use of Tripartite Boards in Labor, Commercial, and International Arbitration, 68 Harv. L.Rev. 293, 296–297 (1954).

12. AAA Case No. 31–13 at 31 AAA Arb. Awards Summary 4.

13. See Phillips, A Lawyer's Approach to Commercial Arbitration, 44 Yale L.J. 31, 48 (1934); Note, The Function of Arbitration in the Settlement of Industrial Disputes, 33 Colum.L.Rev. 1366, 1372–1373 (1933).

14. The Board majority seeks to distinguish *Federated Employers of Nevada, Inc.* because the trial examiner there did not decide whether "coercion to compel an employer to select or agree to an 'umpire' * * * is within the reach of Section 8(b) (1) (B)." But the present case, like that one, involves manage-

and Jones, Inc.), 177 NLRB No. 74 (1969); [15] cf. National Labor Relations Board v. Falls Dodge, Inc., 431 F.2d 33, 35 (6th Cir. 1970). The Union's conduct here was precisely that prohibited by the statute.

*Section 8(b) (3) Violation*

 Since the Union's insistence that the Association agree to jurisdictional dispute settlement by the Interim and new National Joint Boards violated Section 8(b) (1) (B), there is no need to make a threshold determination that this provision was a non-mandatory bargaining subject in order to make out a Section 8(b) (3) violation,[16] as the Trial Examiner did. If the Union's coercion of the Association to accept a contract term is itself otherwise illegal—here because violative of Section 8(b) (1) (B) —insistence on that term as a condition to agreement is *ipso facto* illegal as a "refusal to bargain collectively with an employer" in violation of Section 8(b) (3). See International Typographical Union, AFL–CIO v. National Labor Relations Board, 365 U.S. 705, 81 S.Ct. 855, 6 L.Ed.2d 36, affirming in part 278 F.2d 6 (1st Cir. 1960); General Elec. Co. v. National Labor Relations Board, 412 F.2d 512, 520 (2d Cir. 1969); National Labor Relations Board v. Amalgamated Lithographers of America, 309 F.2d 31, 42 (9th Cir. 1962), certiorari denied, 372 U.S. 943, 83 S.Ct. 936, 9 L. Ed.2d 968; Prudential Ins. Co. of America v. National Labor Relations Board,

278 F.2d 181, 182–183 (3d Cir. 1960); Federated Employers of Nevada, Inc., *supra* at 463, 471. The Union's good faith but mistaken belief that its adamant demand for inclusion of its jurisdictional dispute settlement clause was not unlawful affords no defense to a charge of refusal to bargain. National Labor Relations Board v. My Store, Inc., 345 F.2d 494, 498 n. 2 (7th Cir. 1965), certiorari denied, 382 U.S. 927, 86 S.Ct. 315, 15 L.Ed.2d 340; National Labor Relations Board v. Amalgamated Lithographers of America, *supra*; Taylor Forge & Pipe Works v. N.L.R.B., 234 F. 2d 227, 231 (7th Cir. 1956), certiorari denied, 352 U.S. 942, 77 S.Ct. 265, 1 L. Ed.2d 238.

██ On the assumption that there was no violation of Section 8(b) (1) (B) and that the Union's Joint Board proposal was a mandatory bargaining subject, the Labor Board concluded that the Union. nevertheless violated Section 8(b) (3) because it had assumed "a fixed, inflexible position and was rigidly unwilling to consider seriously any possible alternatives to its proposal that such disputes be submitted to the National Joint Board." 190 NLRB No. 145 at pp. 6–7. This posture it found to be inconsistent with the Union's statutory obligation to bargain in good faith.[17] Although our holding makes it unnecessary to travel this route in order to sustain a Section 8(b) (3) infraction, we think the Labor Board was correct in

---

ment designees to tripartite arbitration panels who are not of the Association's choosing. 135 NLRB at 470–476. As in that case, the question before us does not concern the appointment of a neutral party to serve as an impartial chairman of a tripartite board.

15. See also United Slate, Tile and Composition Roofers (Jones & Jones, Inc.), 172 NLRB No 249 (1968); Southern Calif. Pipe Trades (Aero Plumbing Co.), 167 NLRB 1004 (1967); Painters Dist. Council No. 36, 155 NLRB 1013 (1965); Metropolitan Dist. Council of Phila. (McCloskey & Co.), 137 NLRB 1583 (1962)

16. Section 8(b) (3) provides: "It shall be an unfair labor practice for

a labor organization or its agents— "(3) to refuse to bargain collectively with an employer * * *." (29 U.S.C. § 158(b) (3))

17. Section 8(d) provides in pertinent part: "For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement * * *." (29 U.S.C. § 158(d))

concluding the Section was violated in this respect as well.

As Judge Swygert pointed out in National Labor Relations Board v. Generac Corporation, 354 F.2d 625, 628 (7th Cir. 1965), the obligation imposed by Section 8(b) (3) upon the Union to bargain in good faith with the Association necessitates "a willingness to negotiate toward the possibility of effecting compromises." [18] Here the Board had ample evidence from which to conclude that the Union did not discharge this statutory obligation. As shown in the above statement of facts, at the various bargaining sessions the Association offered several alternative proposals for settling jurisdictional disputes. Each was summarily rejected by the Union without serious consideration. The only such alternative proposed by the Union actually provided that disputes of this nature would have to be resolved by the National Joint Board and would have engendered further jurisdictional disputes.[19] The record simply does not support the Union's belated contention that it offered other genuine alternatives. As additional evidence of the Union's obdurateness the Board points to the statement of Union Business Agent Tremper, made a few hours before the expiration of the contract, that the Union should not even be bargaining with the Association. The implied threat to cut off negotiations entirely for failure to agree to the Union's Joint Board demands is telling. Although neither party is obligated "to agree to a proposal or \* \* \* [to] the making of a concession" (Section 8(d)), the evidence here supports a finding of the Union's intransigent unwillingness to consider seriously any compromise. Therefore, even without our conclusion that Section 8(b) (1) (B) was violated, we would affirm the Board's Section 8(b) (3) conclusion.

In No. 71-1480, the Board's decision with respect to Section 8(b) (1) (B) is set aside and the cause is remanded to the Labor Board for the entry of an order restraining the violation of that Section. In No. 71-1575, the Board's petition for enforcement is granted, but the cause is remanded to the Labor Board to modify its order so as to restrain also the violation of Section 8(b) (3) inherent in the Union's insistence that the Association agree to the resolution of jurisdictional disputes by a tripartite board on which the Association is unrepresented.

18. See also National Labor Relations Board v. Insurance Agents International Union, 361 U.S. 477, 485, 486, 80 S.Ct. 419, 4 L.Ed.2d 454; Cox; The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401, 1411–1412 (1958); Note, Union Refusal to Bargain, Section 8(b) (3) of the National Labor Relations Act, 71 Harv.L.Rev. 502 (1958).

19. This proposal offered by the Union as an "alternative" to Article VIII included the adoption of a section of the International Union's "General Working Rules" defining the craft jurisdiction of the iron workers. The last sentence of that section provided: "The above claims are subject to trade agreements and decisions of the National Joint Board for the Settlement of Jurisdictional Disputes." Because of the proposal's actual identity with Article VIII and because the work claims contained in the section were "at odds with some of the jurisdictional claims of other craft unions," thus inviting jurisdictional disputes, the Association rejected the proposal.