755 F.2d 78
 118 L.R.R.M. (BNA) 2909, 103 Lab.Cas. P 11,682
 INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, Respondent.
 Nos. 84-1496, 84-1758.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 6, 1984.
Decided Jan. 29, 1985.
 
 Roger N. Gold, Gold & Polansky, Chicago, Ill., for petitioner.
 Elinor Stillman, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel N.L.R.B., Washington, D.C., for respondent.
 Before CUMMINGS, Chief Judge and BAUER and WOOD, Circuit Judges.
 CUMMINGS, Chief Judge.
 
 
 1
 This appeal asks us to review an order by the National Labor Relations Board (the "NLRB" or the "Board") against the International Union of Operating Engineers, Local 150 ("Local 150") reported at 268 NLRB No. 200. We enforce the order.
 
 
 2
 * D.J. Johnson Company (the "Company") is a Delaware corporation engaged in the business of brick masonry as a construction subcontractor in DuPage County, Illinois. On August 1, 1981, the Company began masonry work on an apartment building for the elderly in Mount Prospect in adjacent Cook County, Illinois. One of the unions working on the jobsite was Construction and General Laborers' Local 118 ("Local 118") to whom the Company assigned its only forklift operation.
 
 
 3
 William Ruckers, Business Representative of Operating Engineers' Local 150, complained to the Company about this assignment sometime in August 1981. On August 27, members of Local 150 began to picket the jobsite. Local 118 retaliated by threatening to picket the jobsite if the Company replaced the laborer on the forklift with an operating engineer. Thus the Company was presented with a classical work jurisdiction dispute.
 
 
 4
 Understanding the issue in dispute requires understanding the various sources of the obligations of the several parties vis-a-vis jurisdictional disputes. The Company had no collective bargaining agreement with Local 118, though it is bound by an agreement with two other Laborers' locals in DuPage County. Since 1963 the Company has been party to an international agreement (the "International Agreement")[1] negotiated between Local 118's international, Laborers' International Union of North America, and the Mason Contractors Association of America (the "MCAA") with which the Company is affiliated through its membership in the Mason Contractors Association of DuPage County. Article V, paragraph 1, of that Agreement regulated the Company's relations with Local 118 as follows:
 
 
 5
 When the Employer [here D.J. Johnson Company] enters into an area where wages, hours and working conditions have been agreed upon through bona fide collective bargaining, the Employer will be presented such evidence by the Union and the Employer will conform his operations accordingly except that all jurisdictional issues and/or disputes shall be resolved under the provisions of Article III, paragraph 3 "Jurisdiction" of this International Agreement. (Emphasis supplied.)
 
 
 6
 Article III, paragraph 3 provides that "[a]ny dispute over work jurisdiction will be referred to the International Union and the Employer Association [the MCAA] for decision which decision shall be final and binding on all parties." The Agreement provides further in Article X, paragraphs 1 and 3:It is expressly understood and agreed by both parties to this understanding that any agreement or intention expressed in a local union collective bargaining agreement which provides any method for settling jurisdictional disputes that differs from or conflicts with Article III, paragraph 3 "Jurisdiction" of this International Agreement is held to be null and void and of no force and effect.
 
 
 7
 * * *
 
 
 8
 * * *
 
 
 9
 It being expressly understood between the parties hereto that the procedure for adjustment (set out in ARTICLE X) is exclusive and supersedes any other plan, method or procedure outlined in any agreements between a member or members of the Association and any Local Union.
 
 
 10
 The Company had signed a Memorandum of Agreement with Local 150 in 1965 that bound the parties to the terms of any collective bargaining agreements negotiated between Local 150 and the Builders Association of Chicago. The Builders Association of Chicago is affiliated with the Construction Employers' Association.[2] That Association entered into an agreement with the Chicago and Cook County Building and Construction Trades Council (the "Council") in 1913. That agreement is known as the Standard Agreement. The Standard Agreement established the Joint Conference Board (the "JCB") for resolving jurisdictional disputes. The JCB is a body of twenty-four members divided equally between union and management representatives. Its jurisdiction is restricted to disputes arising in Cook County, Illinois. The agreement between Local 150 and the Builders Association of Chicago requires jurisdictional disputes arising in Cook County to be resolved pursuant to the Standard Agreement, thus requiring the Company and Local 150 to submit jurisdictional disputes to the JCB.
 
 
 11
 Local 150 is a member of the Council. Local 118 is a member of the Construction and General Laborers' District Council, which is a member of the Council. Both unions' affiliation with the Council binds them to the Standard Agreement negotiated between the Council and the Construction Employers' Association. Thus both locals are bound to submit jurisdictional disputes to the JCB. Their obligation to abide by the Standard Agreement is an independent duty and need not be set forth in any particular collective bargaining agreement.
 
 
 12
 To summarize, the Company's agreement with Local 150 requires it to submit jurisdictional disputes involving Local 150 to the JCB. That agreement also binds Local 150; in addition Local 150's membership in the Council requires it to submit jurisdictional disputes to the JCB. Local 118 is similarly bound through its affiliation with the Council.
 
 
 13
 As noted, the Company has no collective bargaining agreement with Local 118. Nonetheless, its adoption of the International Agreement requires it to abide by whatever collective bargaining agreement may be in effect in Cook County, except that all jurisdictional disputes must be submitted to the International Union and the MCAA. This exception contradicts the provision in the Company's collective bargaining agreement with Local 150 requiring it to submit work jurisdiction disputes to the JCB.
 
 
 14
 On September 2, 1981, the Company filed unfair labor practice charges against both unions. The Company alleged that they had violated Section 8(b)(4)(D) of the National Labor Relations Act (the "NLRA"), 29 U.S.C. Sec. 158(b)(4)(D), which prohibits strikes or coercive activity undertaken with a jurisdictional object. A hearing officer of the NLRB conducted a hearing on October 1 and 9, 1981, pursuant to Section 10(k) of the NLRA, 29 U.S.C. Sec. 160(k).[3] The Company justified its submission of the dispute to the NLRB by asserting that its acceptance of the International Agreement precluded the NLRB's recognition of any contrary agreement to submit the dispute to the JCB. Local 150 maintained in those proceedings that the Board's Notice of 10(k) Hearing should be quashed since an agreed-upon method, that is, submission of the dispute to the JCB, allegedly existed for resolving the jurisdictional dispute.
 
 
 15
 The Board rejected this contention in a Section 10(k) proceeding with Member Fanning dissenting, and on July 22, 1982, decided the case against Local 150. 262 NLRB 1147. Member Fanning believed that a binding agreed-upon method of settlement existed because all the parties were bound by one of the two dispute settlement procedures at issue, viz., the JCB procedure. In particular, he believed that a failure by both the Company and Local 118 to give formal notice to withdraw from and terminate their respective commitments to honor the decision of the JCB required them to submit to the authority of the JCB which had ruled in favor of Local 150. The Board majority found, however, that it had jurisdiction under Section 10(k) because no "determinative, agreed-upon method of dispute resolution" existed because of the equally binding, conflicting work dispute provisions in the applicable agreements (App. 24).
 
 
 16
 In the meantime, on September 14, 1981, Local 150 requested a hearing before the JCB. The JCB invited the Company to appear but it declined to do so, asserting that it was not bound to any JCB decisions. Both unions appeared and the JCB thereafter awarded the work to Local 150 before the NLRB's October 1981 hearing of this jurisdictional dispute was closed.
 
 
 17
 Local 150 declined to comply with the order the Board entered against it. This refusal resulted in an unfair labor practice proceeding against Local 150 upon a complaint filed by a Regional Director of the Board. That proceeding resulted in a unanimous order against Local 150 issued on February 29, 1984 (App. 1-12), with the Board holding that Local 150 could not relitigate the prior Section 10(k) decision. Its decision and order are reported at 268 NLRB No. 200. Local 150 has asked us to review and set aside the Board's 1984 order, while the Board has requested enforcement. Local 150 contends that the availability of the JCB deprived the Board of jurisdiction. Local 150 does not attack the Board's determination on the merits that Local 150's picketing violated Section 8(b)(4)(i) and (ii)(D) of the Act. The parties have stipulated to the Section 10(k) administrative record (App. 3). We uphold the Board's jurisdiction.
 
 II
 
 18
 Judicial review of agency action is quite limited. Factual findings supported by substantial evidence in the record as a whole are conclusive. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Substantial evidence exists if the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). A preponderance of the evidence is unnecessary, as long as "there is a rational connection between the facts found and the choice made." Bloomer Shippers Association v. ICC, 679 F.2d 668, 672 (7th Cir.1982). Similarly, the Board's interpretation of the NLRA will be upheld as long as it has " 'a reasonable basis in law.' " Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 166, 92 S.Ct. 383, 390, 30 L.Ed.2d 341 (1971) (quoting NLRB v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944)).
 
 
 19
 Local 150 challenges the Board's decision in four respects: (1) it disputes the Board's determination that the various parties' commitments to use the JCB did not constitute an agreed-upon method of jurisdictional dispute resolution; (2) it contests the Board's factual finding that the International Agreement abrogated the Company's obligation to use the JCB; (3) it alleges that the Board's decision constitutes an unexplained, unwarranted departure from precedent; (4) it contends that the Board's decision undermines the policies of Section 10(k) in particular and the federal labor laws in general favoring private resolution of labor disputes, herein the JCB.
 
 
 20
 The central issue is whether or not the International Agreement vitiated the Company's otherwise binding agreement to carry all jurisdictional disputes involving Local 150 to the JCB for resolution. Consequently, the validity of Local 150's objections depends upon the proper construction of the International Agreement. This determination depends on whether the International Agreement extends to a jurisdictional dispute between two local unions in Cook County if one of the local unions involved happens to be a Laborers' affiliate. A second necessary determination is whether, even if the dispute at issue is within the scope of the International Agreement, the various other agreements separately binding each party to use the JCB constitute an agreed-upon method of jurisdictional dispute resolution so that the NLRB would be without jurisdiction under Section 10(k) of the NLRA (quoted in note 3 supra ).
 
 
 21
 Contrary to the allegations of Local 150, the Company did have an agreement with Local 118. The agreement was not a formal one negotiated between the two parties directly. Rather the International Agreement constituted the contract governing relations between the two organizations. The International Agreement provided for wages, hours and working conditions by stipulating that the terms of any local agreement resulting from "bona fide collective bargaining" (Article V, p 1) would control. The only exception is work jurisdiction disputes, which must be resolved according to the mechanisms established in the International Agreement.[4] The Company was conducting its relations with Local 118 in accordance with the International Agreement and certainly considered it to be the controlling document. Local 118 provided the Company evidence of the relevant local agreement (Board Tr. 90-92) as Article V of the International Agreement mandates, so that Local 118 also regarded the International Agreement as controlling.[5]
 
 
 22
 Local 150 might argue that even if the International Agreement were the controlling document, it cannot suspend the work jurisdiction requirements of Local 150's agreement with the Company because it was signed subsequently to the Company's acceptance of the International Agreement. The NLRB has on occasion allowed a subsequent agreement between an employer and the International of a union to abrogate a previously entered into agreement between the International's local and the employer. See Carpenters Local 1906 (Modern Erection Service), 249 NLRB 234, 235 (1980); Laborers' District Council of Washington, D.C. (Western Caissons, Inc.), 240 NLRB 1161, 1163 (1979). These decisions do not suggest, however, that the only way to rescind an international agreement is through a subsequent agreement between a local and an employer. The language of this International Agreement does not restrict itself to affecting agreements already in existence, as was true of the international agreement in Western Caissons, 240 NLRB at 1163. Prohibiting employer associations and national or international organizations from agreeing to one method of dispute resolution despite conflicting provisions that their affiliates may accept in future local agreements is unnecessarily restrictive of their freedom to contract. They could still circumvent a contrary local agreement easily by renewing their Article X-type of restriction each year. The ease with which the parties could do so suggests the inappropriateness of formulating case law in such a manner.
 
 
 23
 A stronger reason for interpreting the International Agreement as applicable is its relatively minimal impact on the Company's collective bargaining agreement with Local 150. The International Agreement intended to require the Company to submit to the procedures that agreement had established for those work jurisdiction disputes involving Local 118. Thus, it contradicts the Company's collective bargaining agreement with Local 150 only to the extent that Local 118, as opposed to any other union that might have been involved, happens to be the other party. The Company still must use the JCB to resolve other work jurisdiction disputes involving Local 150. Local 150's assertion that the International Agreement intends to abrogate all of the Company's work jurisdiction agreements, regardless of whether the Laborers are involved, is simply without merit.[6]
 
 
 24
 Laborers' Local 118 (Ronald Huber d/b/a Huber Masonry), 260 NLRB 1417 (1982), does not undermine this conclusion. That case involved the same unions that are parties to this dispute, Local 150 and Local 118. Again Local 150 argued that all parties had agreed to submit the dispute to the JCB. The employer, like the employer here, was based outside of Cook County. It argued that because it was not a member of the Construction Employers' Association, it was not subject to the JCB's jurisdiction. The NLRB rejected this superficial excuse, just as it rejected that employer's allegation that it could not initiate disputes before the JCB. Id. at 1419. If these facts were the only ones involved in the instant situation, then Local 150's arguments would have merit. But the existence of the International Agreement, to which the Company is also bound, precludes finding that an agreed-upon forum does exist in the JCB.
 
 
 25
 The situation is in fact similar to that in Laborers' District Council of Washington, D.C. (Fruin-Colon Corp.), 241 NLRB 128 (1979). The employer there had signed two independent collective bargaining agreements with two different unions. Both agreements required the employer and the union to arbitrate work jurisdiction disputes. Even though both agreements required the two parties to invite the second union to the arbitration proceeding, nothing required that second union to attend. Id. at 128. Consequently, no single proceeding would necessarily bind all three parties in interest. Furthermore, the two unions could require the employer to arbitrate the grievance in two separate arbitrations on the same subject matter, possibly yielding two contradictory awards. Id. That situation is precisely the one that occurred in the instant situation. The JCB reached one decision. The NLRB (and presumably the MCAA if it had had the opportunity to hear the dispute under the International Agreement[7]) reached the opposite result.
 
 
 26
 Local 150 argues vigorously that the existence of one procedure binding all three parties--the JCB--distinguishes cases such as Fruin-Colon. In support of this argument, Local 150 cites Sheet Metal Workers Local 359 (E.L.T. Piping), 217 NLRB 987 (1975). There the employer's collective bargaining agreement with the sheet metal workers local conflicted with its agreement with the local's international. The other union and the employer were separately bound to the dispute mechanism mandated by the sheet metal workers' International. The Board ruled that it lacked jurisdiction under Section 10(k) because an agreed-upon method of settlement existed. Thus E.L.T. Piping illustrates the situation where an international agreement has abrogated the local one, precisely what happened in this case. The case does not represent the situation where all parties may be bound to one forum, but at least one of the parties is also bound to another, conflicting forum.
 
 
 27
 The International Agreement here does not abrogate the Company's agreement with Local 150. Instead it suspends the contrary provision with Local 118 that appears in the local collective bargaining agreement whose terms the International Agreement incorporates. If no such provision had appeared in the local agreement, then the International Agreement would abrogate Local 118's and the Company's independent obligations to submit to the jurisdiction of the JCB. Insofar as the International Agreement supersedes any local agreement to which Local 118 or the Company may have assented, E.L.T. Piping is in accord with the Board's decision here.
 
 
 28
 Nor can Local 150 argue that the International Agreement is not equally binding because it does not affect all parties. The logic of this argument is faulty. Local 150 asserts that the dispositive factor in FruinColon is that no dispute bound all the parties but that if one arbitration proceeding would have bound all the parties while the second one bound fewer parties, then the NLRB would have had no jurisdiction (Reply Br. 12). But the thrust of the NLRB decision was that no "overall" settlement that would prevail over any other contradictory settlement was possible. Fruin-Colon, 241 NLRB at 268.[8] The NLRB in fact concluded that the "Board has long held that the voluntary adjustment must be binding upon both disputing unions as well as the employer to come within the meaning of voluntary settlement as set out in Section 10(k)." Id.
 
 
 29
 While Fruin-Colon emphasized the lack of binding agreement upon both unions, Western Caissons, supra, emphasized the failure of the employer to commit itself irrevocably to one forum. The two cases read together illustrate the importance of each party's having accepted a single forum without the spectre of conflicting requirements. The International Agreement precludes concluding an agreed-upon method of determination exists because it is just as binding on the Company as is the Company's collective bargaining agreement with Local 150. The Company does not owe a higher obligation to submit the dispute to the JCB merely because the two unions owe separate duties to do so also. In terms of determining the scope of the Company's obligations under the International Agreement, whatever the local unions involved may have accepted is irrelevant.
 
 
 30
 That the International Agreement expressly provides that its provisions for work dispute resolutions override those of whatever agreement the Company may have either with a Laborer local with whom it has negotiated a collective bargaining agreement, or with a Laborer local with which it is operating under the terms of a local collective bargaining agreement not actually negotiated between the two parties, emphasizes the extent to which it binds the Company. The International Agreement governs all areas of concern between Local 118 and the Company and is tantamount to an agreement negotiated between them. It governs their relationship, including the appropriate manner in which to resolve work jurisdiction disputes. Because that manner of disposition conflicts with the mode prescribed between the Company and Local 150, even though Local 118 would also be bound to submit to the JCB in a work jurisdiction dispute with a company not bound by the International Agreement, no agreed-upon method of dispute resolution exists in this situation and the Board accordingly has jurisdiction to decide the case.[9]
 
 
 31
 This result is fully in accord with the policies underlying the federal labor laws and Section 10(k). Local 150 correctly states that national labor policy strongly favors private arbitration of labor disputes. But Local 150 impermissibly minimizes that the federal labor laws favor the voluntary private arbitration of disputes. See, e.g., Laborers' Local 309 v. W.W. Bennett Construction Co., 686 F.2d 1267, 1277 (7th Cir.1982) ("[f]ederal labor law favors only voluntary arbitration of disputes" (emphasis in original)). When a party to a dispute has conflicting agreements with the two unions involved, then no voluntary agreement binding all parties, without the risk of conflicting judgments, exists. Section 10(k) especially "contemplates only a voluntary agreement as a bar to a Board decision." NLRB v. Plasterers' Local 79, 404 U.S. 116, 133, 92 S.Ct. 360, 371, 30 L.Ed.2d 312. Congress designed Section 10(k) not only to support the enforcement of private, voluntary agreements but also "to protect employers and the public from the detrimental economic impact" of jurisdictional strikes or picketing. See id. at 130, 92 S.Ct. at 369. The Board does so by making work awards to resolve the dispute permanently when no private agreement will do so. In the instant case, the NLRB's not resolving the dispute would subject the Company to conflicting awards--one by the MCAA/Laborers' International favoring Local 118 (see note 7 supra ) and one by the JCB favoring Local 150. The NLRB's acceptance of jurisdiction is necessary to avoid this result.
 
 
 32
 W.R. Grace and Co. v. Local Union 759, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298, is not dispositive of this case. There the Supreme Court enforced an award of back pay given for the employer's violation of its collective bargaining agreement whose terms governing employee lay-offs conflicted with an Equal Employment Opportunity Commission ("EEOC") conciliation agreement. The Court refused to require the collective bargaining agreement to defer to the terms of the EEOC agreement, leading Local 150 to argue here that similarly we should not allow the terms of the Company's agreement with Local 150 to give way to its agreement with the Laborers' International. The short answer is that neither is giving way to the other; the work jurisdiction provisions of neither agreement are being enforced in favor of NLRB determination pursuant to Section 10(k). Furthermore, W.R. Grace and Co. involved a proceeding under Section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185.[10] Had Local 150 proceeded under Section 301, it may have been able to have its agreement to submit disputes to the JCB enforced. But its election to picket unlawfully and the subsequent NLRB determination here may undermine its ability to rely on Section 301. See Teamsters Local 50 v. McCartin-McAuliffe Mechanical Contractor, Inc., 708 F.2d 313 (7th Cir.1983). Section 301 is directed solely at the particular collective bargaining agreement placed before it and does not consider potential conflicting agreements that one of the parties may have signed. That consideration is the province of Section 10(k), so that Local 150's reliance on cases decided under Section 301 is misplaced.
 
 
 33
 Substantial evidence in the record justifies the NLRB's determination of the scope and impact of the International Agreement on the Company's conflicting obligations under its collective bargaining agreement with Local 150. Both agreements purported to provide exclusive fora, and neither can be said to override the other. Therefore, the NLRB's assumption of jurisdiction was well within the reach of Section 10(k). The Board's order will be enforced.
 
 
 
 [1]
 The International Agreement was modified on June 1, 1981, to include "forklifts for brick masons" within the work jurisdiction of the International Union's locals (App. 25)
 
 
 [2]
 The Construction Employers' Association was previously known as the Building Construction Employers' Association of Chicago, Inc. The current name will be used herein
 
 
 [3]
 Section 10(k) provides:
 Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.
 
 
 [4]
 Local 150 attempts to attack the validity of the International Agreement by arguing that it purports to govern any work jurisdiction dispute in which the Company might become embroiled and that the consequences of this interpretation are so absurd that they defeat such a reading of the Agreement. Local 150 reads too much into the International Agreement's provisions for jurisdiction. Admittedly Articles V and X, supra, are broadly worded. What must be remembered is that the work jurisdiction provisions govern two types of agreements. They govern collective bargaining agreements between local union affiliates and MCAA local affiliates. They also govern relations between Laborers' local unions and MCAA local members who are operating without a direct collective bargaining agreement between them but conduct their affairs pursuant to the terms of whatever local agreement may be in effect. Such agreements might be between an employer association and a group of unions, such as the Standard Agreement itself, so that designating such an agreement as a "Laborers' Local Union collective bargaining agreement," rather than using the term "local union collective bargaining agreement" adopted by Article X, would be inaccurate. The broader wording is not meant to imply that the International Agreement would encompass agreements between a local union that is not affiliated with the Laborers and a MCAA local member, such as the Company's collective bargaining agreement with Local 150. This latter agreement is affected only when the other union involved is a Laborers' affiliate. Only then would the International Agreement operate to provide a competing forum for jurisdictional dispute resolution
 
 
 [5]
 Donald Johnson, the owner of the Company, testified that Local 118 had presented his Company with evidence of wages, hours and working conditions that the Laborers had accepted in Cook County (Board Tr. 90-92). That this evidence was by letter, and that Mr. Johnson (or anyone else in his company) had never seen this agreement does not detract from the binding force the Company chose to give it by abiding by its terms. The letter evidently accurately described the Company's obligations to Local 118 under the Cook County agreement
 The particular agreement in effect in this instance was a "Builders Agreement" negotiated by the Construction and General Laborers' District Council (of which Local 118 is a member) and by the Mid-America Regional Bargaining Association on behalf of the Mason Contractors Association of Greater Chicago and other employer associations. See Board Tr. 257-262 (testimony of Joseph DeRose, business manager of Local 118); id. at 279-280 (testimony of Lloyd Anderson, field superintendent of the Company); Local 150 Ex. 11 (containing the agreement). Even Local 150 conceded in its post-hearing brief to the Board that the Company and Local 118 were operating under the terms of this agreement (Post Hearing Br. 8-9). This agreement required work jurisdiction disputes to be submitted to the JCB, but the International Agreement's conflicting requirement overrides this provision in the local agreement, as discussed infra, by virtue of Article V, paragraph 1, and Article X, paragraph 1, of the International Agreement quoted supra.
 
 
 [6]
 See n. 4 supra. The NLRB has recognized that an agreement between a national employers' association and the international of a union may supersede whatever contrary arrangement the local union affiliate and local employer may have. See, e.g., Sheet Metal Workers Local 359 (E.L.T. Piping), 217 NLRB 987 (1975). The Board there made no mention of the respective dates of the international agreement and local collective bargaining agreement that were in dispute, suggesting that timing is not important. Membership in an association alone can also bind a local union to an agreement to submit work jurisdiction disputes to a specified forum. See Western Caissons, supra. The International Agreement here merely contradicts Local 118's otherwise binding obligation to submit the dispute to the JCB
 
 
 [7]
 The International Agreement requires work jurisdiction disputes to be submitted to the International Union and the MCAA for final, binding resolution. Presumably these parties would award the work to Local 118, the affiliate of the International Union and the union preferred by the employer
 The possible bias of the system established by the International Agreement is not at issue. The viability of the Company's agreeing to comply with the International Agreement is the issue, not which procedure--that mandated by the International Agreement or that requiring submission to the JCB--is relatively fairer.
 
 
 [8]
 In Fruin-Colon, both unions and the employer were signatories to an agreement called the Multi-Craft Agreement. One of the unions argued that the existence of this agreement, binding upon both unions involved, meant that a voluntary procedure binding all parties was available. The union did not argue, as Local 150 suggests, that as long as one procedure binding all parties was available, the existence of another procedure--there the two collective bargaining agreements--binding less than all the parties was irrelevant. The Multi-Craft Agreement was to the two collective bargaining agreements what the International Agreement is to the Cook County agreement governing relations between Local 118 and the Company, or what the International Agreement would be to any direct collective bargaining agreement that Local 118 and the Company might have. The Multi-Craft Agreement was ineffective because it lacked an independent provision containing an agreed-upon method for voluntary adjustment--instead incorporating by reference the terms of existing craft agreements--and did not require either union "to attend an arbitration proceeding held by the other union and the Employer." Fruin-Colon, 241 NLRB at 127-128. The Multi-Craft Agreement, because it would supersede any conflicting collective bargaining agreement of both signatory unions, did not resolve the dilemma of a party to a jurisdictional dispute being equally obligated to comply with two different procedures
 
 
 [9]
 Other cases cited by Local 150 and not discussed supra are also inapposite. For instance, Sheet Metal Workers Local 360 (United Piping & Erecting Co.), 255 NLRB 836 (1981), and Painters Local 203 (E.O. Brunner Plastering Co.), 234 NLRB 235 (1978), both involved situations in which the Board refused to accept the parties' stipulation that no agreed-upon method for resolving the dispute existed. Thus the cases stand for no more than that the Board could not accept their stipulation to its jurisdiction that might or might not actually exist but had to determine independently whether it had jurisdiction to hear the dispute
 Similarly the Board has not allowed parties to defeat submitting a dispute to a forum upon which they had previously agreed simply because a party has decided not to comply in a particular situation. Int'l Union of Operating Engineers, Local 17 (Sullivan & Humes), 254 NLRB 71 (1981) (one party refused to utilize procedure); Sheet Metal Workers Local 359 (E.L.T. Piping), 217 NLRB 987 (1975) (alleged private agreement between two unions not to use agreed-upon forum held ineffective to negate contractual obligation to use forum); Ironworkers Local 380, 204 NLRB 353 (1973) (the agreed-upon forum could not award work to one of the unions because it was in noncompliance with an earlier award); Laborers' Local 423 (V & C Brickcleaning Co.), 203 NLRB 1015 (1973) (same).
 While an employer may not rescind an agreement through unilateral decision or some secret agreement, using like means--for example, signing another contract with another party, such as the international of a local labor union--is effective to negate any finding of an agreed-upon method of work jurisdiction dispute resolution. See E.L.T. Piping, discussed in text supra.
 
 
 [10]
 Section 301 expressly allows "[s]uits for violation of contracts between an employer and a labor organization." 29 U.S.C. Sec. 185(a)